ANTHONY MAGLIONE, M.D., PLAINTIFF v. AEGIS FAMILY HEALTH CENTERS,
A NORTH CAROLINA NONPROFIT CORPORATION, DEFENDANT

No. COA03-1488

(Filed 18 January 2005)

### 1. Appeal and Error— preservation of issues—failure to object

Although plaintiff contends that the trial court erred in a breach of contract action by denying his request for jury instructions on the interpretation of an ambiguous contractual provision, this issue is not properly before the Court of Appeals because: (1) plaintiff did not object to or otherwise properly preserve this issue; and (2) the transcript shows plaintiff voluntarily withdrew his request of this instruction.

### 2. Contracts— breach of contract—instruction—implied covenant of good faith and fair dealing

The trial court erred in a doctor's breach of employment contract action by failing to submit to the jury an instruction on the implied covenant of good faith and fair dealing, because: (1) plaintiff properly submitted the request for special jury instruction under N.C.G.S. § 1A-1, Rule 51(b), and it was a correct statement of the law; (2) the evidence viewed in a light most favorable to plaintiff was sufficient to have warranted this instruction, and without such instruction, there is a likelihood the jury was misled; (3) defendant employer provided notice that a change to the calculation method would not occur until the next fiscal year in a memo suggesting that fair dealing under the contract would require at least notice of this switch, and then changed the method the very next quarter without providing notice; and (4) the evidence suggesting defendant's economic disarray provides the jury with a potential motive for defendant's acting with potential bad faith and unfair dealing.

### 3. Evidence— hearsay—party admissions exception—unfairly prejudicial

The trial court did not abuse its discretion in a doctor's breach of employment contract case regarding plaintiff's bonus by denying admission of the testimony of another doctor employed by defendant relating discussions that doctor had with defendant's chief executive officer and defendant's director of financial management about his bonus even though the trial court

erred by finding this testimony did not fit the hearsay exception of party admissions under N.C.G.S. § 8C-1, Rule 801(d), because the evidence was prejudicially misleading under N.C.G.S. § 8C-1, Rule 403 since the evidence could have confused the jury to find in favor of plaintiff based only on the evidence of defendant's actions and potential breach of its contract with the testifying doctor.

**4. Evidence— prior performance problems—rebuttal evidence**

The trial court did not abuse its discretion in a breach of employment contract case by allowing defendant to cross-examine plaintiff doctor concerning prior performance problems plaintiff had at another hospital, because: (1) the trial court is granted great deference in its determination of relevant rebuttal evidence; and (2) plaintiff was allowed to testify over defendant's objection for relevance that his previous collection rate before working at the pertinent company was 68%, and defendant properly rebutted this testimony by revealing through plaintiff's cross-examination that plaintiff experienced performance problems in his prior position including problems collecting for charges on medical tests based on insufficient medical documentation to justify the tests and incidences of having left a room while severe stress inducing tests on patients' hearts were being conducted.

**5. Evidence— relevancy—reservations about hiring—opportunity to remain in employment under certain conditions**

The trial court did not err in a breach of employment contract case by admitting evidence relating to defendant's reservations about hiring plaintiff doctor and that plaintiff was offered an opportunity to remain in defendant's employment under certain conditions, because: (1) the evidence of defendant's reservations is of some relevance to rebut plaintiff's offered evidence of his high collection rate at a previous hospital and his generally successful cardiology practice; and (2) the evidence of defendant's contingent employment is of some relevance to both the issues of defendant's attempt to mitigate any damages had the jury found defendant in breach, and it goes toward defendant's good faith and fair dealing for attempting to adhere to its interpretation of the employment contract terms.

MAGLIONE v. AEGIS FAMILY HEALTH CTRS.

[168 N.C. App. 49 (2005)]

Appeal by plaintiff from judgment entered 19 June 2003 by Judge Richard L. Doughton in Caldwell County Superior Court. Heard in the Court of Appeals 31 August 2004.

*Wilson, Lackey & Rohr, P.C., by David S. Lackey, for plaintiff appellant.*

*Smith Moore L.L.P., by Julie C. Theall and Beth Mabe Gianopulos, for defendant appellee.*

McCULLOUGH, Judge.

Plaintiff appeals from a judgment by the trial court entered pursuant to a jury's verdict denying his claim for breach of contract. Issues arising in this appeal are based upon the following evidence presented at trial: Plaintiff, a board certified cardiologist licensed to practice medicine in the states of North Carolina, New York, and Georgia entered into an employment contract ("the contract") with Aegis Family Health Centers ("defendant"), a North Carolina non-profit corporate organization. The contract became effective on 5 April 1999 and continued for a period of twelve (12) months. The base salary as provided in the contract was $200,000, along with a Provider Incentive Compensation Plan ("PICP") which governed bonuses awarded under the contract. The PICP was attached to and incorporated into the contract.

The PICP awarded bonuses annually based on a physician meeting six performance criteria: quality of care; patient satisfaction; cost/affordability of care; contributions to the community; contributions to the company; and provider productivity. During the 1999-2000 fiscal year, only provider productivity was being measured for purposes of the PICP. The productivity criteria required the physician to produce sufficient revenues to surpass a certain revenue "threshold." This threshold was determined on a physician-by-physician basis after considering the overhead of a physician's individual practice. If revenues surpassed this threshold, the physician then received a certain percentage, approximately 30%, of the revenue above this threshold. Defendant retained the remainder.

In determining a physician's productivity, the PICP incorporated one of two varying methods to calculate these revenues. The PICP stated:

Timing differences in the realization of revenue, i.e. cash in the door, and the date the service was delivered to a patient, may

cause productivity numbers not to match up in exact quarters. Aegis recognizes the potential of these timing differences to affect quarterly productivity numbers. Therefore Aegis will consistently review reports and processes in order to determine a methodology that most accurately provides productivity information. Aegis will use one of two methods when determining physician/midlevel revenue:

1. Actual revenue collected on behalf of the physician/ midlevel for the month, quarter, year, or

2. Gross Professional Charges multiplied by the collection rate of the practice site[.]

The first method ("actual revenue method") for determining productivity was what "cash [came] in the door" for the applicable measure of time, regardless of when the care was actually provided. The second method ("collection rate method") consisted of multiplying the physician's gross charges for each quarter by the historical collection rate for the practice where the physician worked.

Pursuant to the employment contract, plaintiff was hired by defendant to work at Thompson Medical Specialist Center ("Thompson"). At the time of plaintiff's employment, defendant had traditionally used the collection rate method for determining the quarterly revenue for the PICP. The collection rate at Thompson for the relevant time was approximately 60%. For the first two quarters of the fiscal year of 1999-2000, defendant calculated plaintiff's revenue using the collection rate method.

At the start of the third quarter, in January 2000, defendant's founder, president, and Chief Executive Officer (CEO), Dr. Edward Huntsinger ("Dr. Huntsinger"), expressed concern to plaintiff about his low collection rate because it was at about half the percentage of Thompson's historical average, or at about 25-30%. Thereafter, beginning with the third quarter of the 1 July 1999 fiscal year, defendant began measuring plaintiff's revenue, for purposes of calculating the PICP bonus, using the actual revenue method. Plaintiff was never given notice that defendant was switching to the actual revenue calculation method.

Plaintiff attributed his low collection rate to two factors. The first factor related to the 1 July 1999 fiscal year, where patients at Thompson were being charged for a number of the cardiology services greatly in excess of the prevailing market rate. The charges had

been increased without consulting the cardiologists at Thompson. The second factor related to a coding modifier used to identify and separate the professional service charges provided by the physician and the technical service charges owed to Thompson. The coding modifier was not being entered correctly and it therefore appeared to third-party providers—insurance companies, Medicare, and Medicaid—that plaintiff was overcharging patients for his professional services in addition to already assessing charges well above the market rate. Generally, third-party providers, no matter the itemized charge, will only pay out at the usual, customary, and reasonable amounts for any particular service. The result of these two factors was that plaintiff's itemized charges for a number of procedures were exceptionally high in the first two quarters of his employment. The third-party providers were paying out only reasonable, lesser amounts. This caused plaintiff's collection rate to appear much lower than it would had charges been accurately assessed.

Plaintiff brought these factors of overcharging to the attention of defendant's director of financial management, Sterling Wooten ("Mr. Wooten"). Mr. Wooten was the developer of the PICP and managed the plan during the relevant time period. In August of 1999, Mr. Wooten testified that:

> I told [plaintiff] that, well he had sent me a fax through Laura Caruso, the practice manager, and then I got in touch with him and told him that I would research those, and check them out. He was concerned about the prices being to [sic] high and effecting [sic] patients, or either have us look bad in the community, by being way out of line with our charges.

Pursuant to Mr. Wooten's research into the matter, he sent plaintiff a memo (the "cardiology fee memo") dated 22 November 1999 comparing the overcharges with the appropriate charges. This showed a great disparity in what should have been charged and what was actually being charged. In the memo, Mr. Wooten stated the following:

> This pricing issue also has an effect [sic] on your bonus calculations. Since the pricing was substantially higher than the actual collected. Ultimately it has lowered your collection rate to below 25%. This collection rate does not reflect a true picture of what your rates should be, nor does it reflect a true threshold for each of you when it is incorporated into the PICP formula. Therefore, I have gone back for the quarter July through September and "repriced" your charges . . . . This change more appropriately

> reflects your actual performance, and it allows the PICP to keep your collection rate at 60%, which is consistent with your peers at the practice.

In another memo (the "PICP bonus report memo") from Mr. Wooten to plaintiff, also dated 22 November 1999, the PICP bonus report was issued. The report included changes that had been effective 1 July 1999 which increased the maximum bonus a provider could earn for productivity from 30% to 40% above each physician's threshold, depending on how much above the threshold they earned. Also included in the PICP bonus report memo was the following language:

> We continue to modify and adjust the compensation plan to reflect the strategy changes of Aegis and the market changes in health care. We anticipate more changes in the plan next fiscal year, which may include but are not limited to: <u>changes in scoring on the checklist, scoring for quality of care,</u> and <u>using actual dollars collected instead of collection percentages</u>.

(Emphasis in original.)

Sometime in January of 2000, plaintiff negotiated a second employment contract with defendant, becoming effective 5 April 2000 at the expiration of the first contract. This employment contract provided a base salary of $300,000, and an added provision stating:

> **3.7 Coding and Documentation.** Physician will accept responsibility for the proper diagnoses and procedures which are supported with timely and accurate documentation according to standards set forth and approved by [defendant]. Physician will maintain a level of accuracy in the aforementioned documen-tation as set forth by the [defendant]. Physician acknowledges that failure to maintain these standards may impact phy-sician's base salary, bonus and continued employment. Physician further acknowledges that Medicare, Medicaid, other governmental agencies and private payors require Physician's [sic] to document properly as a prerequisite to reimbursement for patient care services.

At trial, defendant asserted that this was added due to plaintiff's difficulties in providing the required documentation for billing and collection purposes required for defendant's reimbursement. This second contract was later terminated due to the same collection difficulties, along with both plaintiff's large base salary which was

straining the financially struggling defendant and some interpersonal issues plaintiff had with a number of people.

Plaintiff filed suit on 21 March 2002 against defendant seeking to recover additional PICP bonus monies which he claimed were owed to him under the first employment contract for the fiscal year of 1 July 1999. Plaintiff's claims were for breach of contract and for defendant's violations of North Carolina's Wage and Hour Act, N.C. Gen. Stat. § 95-24, *et seq.* (2003). The case was tried by jury at the 3 June 2003 Civil Term of Superior Court in Caldwell County before the Honorable Richard L. Doughton. The jury found defendant had not breached the contract, and pursuant thereto the court entered judgment awarding plaintiff nothing.

On appeal plaintiff raises two issues concerning jury instructions plaintiff had submitted to the trial court but which were denied. Additionally, plaintiff raises four evidentiary issues where the trial court allegedly improperly admitted or denied certain offered evidence. We address these issues in turn and incorporate further relevant facts when necessary.

## Jury Instructions

**[1]** Plaintiff contends that the court erred in denying his request for jury instructions on the following: interpretation of an ambiguous contractual provision, and on the implied covenant of good faith and fair dealing of a contract. Plaintiff did not object to or otherwise properly preserve the issue of whether the trial court erred in denying an instruction on contract ambiguity, and the transcript shows he voluntarily withdrew his request of this instruction. Therefore, pursuant to Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure, that issue is not properly before this Court to review and is hereby dismissed. N.C.R. App. P. 10(b)(2) (2004) (requiring a party to object to the omission of a jury instruction to be able to assign the omission as error). However, plaintiff did properly object to the court's denial of the requested instruction on good faith and fair dealing, and we agree that the evidence warranted such an instruction. On that basis, we grant a new trial.

### I. Standard of Review

"When a party's requested jury instruction is correct and supported by the evidence, the trial court is required to give the instruction." *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.*, 146 N.C. App. 449, 464, 553 S.E.2d 431, 441 (2001), *disc. review denied*, 356

N.C. 315, 571 S.E.2d 220 (2002). On this basis, for an appeal to prevail, plaintiffs must show "that (1) the requested instruction was a correct statement of law and (2) was supported by the evidence, and that (3) the instruction given, considered in its entirety, failed to encompass the substance of the law requested and (4) such failure likely misled the jury." *Liborio v. King*, 150 N.C. App. 531, 534, 564 S.E.2d 272, 274, *disc. review denied*, 356 N.C. 304, 570 S.E.2d 726 (2002)). "The instructions must be based on evidence, which when viewed in the light most favorable to the proponent, will support a reasonable inference of each essential element of the claim or defense asserted." *Anderson v. Austin*, 115 N.C. App. 134, 136, 443 S.E.2d 737, 739, *disc. review denied*, 338 N.C. 514, 452 S.E.2d 806 (1994) (citations omitted). "When a party aptly tenders a written request for a specific instruction which is correct in itself and supported by evidence, the failure of the court to give the instruction, at least in substance, is error." *Faeber v. E. C. T. Corp.*, 16 N.C. App. 429, 430, 192 S.E.2d 1, 2 (1972). However, the trial court need not give the exact instruction as requested, and will not be found to be in error so long as "the substance of the requested instruction" is given. *Parker v. Barefoot*, 130 N.C. App. 18, 20, 502 S.E.2d 42, 44 (1998), *rev'd on other grounds*, 351 N.C. 40, 519 S.E.2d 315 (1999).

## II. *Implied Covenant of Good Faith and Fair Dealing*

In addition to its express terms, a contract contains all terms that are necessarily implied "to effect the intention of the parties" and which are not in conflict with the express terms. *Lane v. Scarborough*, 284 N.C. 407, 410, 200 S.E.2d 622, 624 (1973) (citations omitted.) Among these implied terms is the "basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Weyerhaeuser Co. v. Building Supply Co.*, 40 N.C. App. 743, 746, 253 S.E.2d 625, 627 (1979) (citations omitted). All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose. *Id.*

## III. *Requested Instruction and Evidence in Support of*

[2] Pursuant to N.C. Gen. Stat. § 1A-1, Rule 51(b) (2003), plaintiff submitted the following request for special jury instruction:

> The law implies an agreement by the parties to a contract to do and perform those things that according to reason and justice

they should do in order to carry out the purpose for which the contract was made. Moreover, in every contract there exists an implied contract of good faith and fair dealing; and more specifically, under such rule, the law will imply an agreement that neither party will do anything which will destroy or injure the right of the other to receive the benefits of the agreement.

In light of *Weyerhaeuser Co.*, we find this to be a correct statement of the law.

Furthermore, we find the evidence, when viewed in a light most favorable to plaintiff, was sufficient to have warranted this instruction, and that without such instruction, there is a likelihood the jury was misled. Plaintiff's evidence of breach of the implied covenant of good faith and fair dealing was supported by the following: Throughout the PICP, defendant's bonus program is referred to as an "annual bonus program." Up until 31 December of the July 1999 fiscal year, defendant had always used the collection rate method to calculate physician's revenue for purposes of the PICP bonuses. During the first two quarters of the fiscal year beginning 1 July 1999, defendant used this method. Also in the course of the first two quarters, plaintiff brought to the attention of defendant over billing of certain cardiology procedures, as well as defendant's incorrect billing modifier that was charging patients of plaintiff for both professional and technical services, instead of merely the professional services provided by plaintiff. After defendant had looked into this over-billing matter, defendant sent plaintiff the 22 November 1999 "cardiology fee memo" explaining defendant's error in billing, and attributing plaintiff's low collection rate to this error. Plaintiff and defendant agreed to recalculate plaintiff's bonus in light of these discovered errors. In the "PICP bonus report memo," also dated 22 November 1999, defendant stated that changes to the annual PICP were anticipated in the "next fiscal year," and such changes could include switching from the collection rate method to the actual revenue method for calculating PICP bonuses. However, for the third and fourth quarters of the July 1999 fiscal year, starting in January of 2000 and just a month and a half after plaintiff was given the two memos acknowledging defendant's own billing mistakes made and the potential changes to the PICP calculations for the *next fiscal year*, defendant switched to the actual revenue method for calculating plaintiff's PICP. Defendant made the switch on the grounds that plaintiff's collection rate was approximately half that of Thompson's historical collection rate.

MAGLIONE v. AEGIS FAMILY HEALTH CTRS.

[168 N.C. App. 49 (2005)]

In January, defendant met with plaintiff to discuss potential remedies to plaintiff's low collection rate, which had remained at around 30% despite the changes defendant had made to fix their over-billing issues. There was no evidence from this meeting that plaintiff was put on notice that defendant was switching or may switch to the actual revenue method. In February of 2000, plaintiff signed another employment contract to begin at the expiration of the first contract, increasing his base salary by $100,000. There is no evidence surrounding the negotiation of this second employment contract, also containing the PICP, that defendant specified to plaintiff they had switched or may switch to the actual revenue method under the current contract or the second contract. And finally, evidence suggests that defendant was in economic disarray during the third and fourth quarters of the July 1999 fiscal year, during which time it switched to the actual revenue method.

Assuming, without opinion, that the relevant contract was unambiguous such that it is clear defendant can switch the PICP bonus calculation method on a quarterly basis and is not required to use the same method throughout a fiscal year, we believe the evidence set out above supports a claim that defendant breached their duty of good faith and fair dealing. Moreover, defendant provided notice that a change to the calculation method would not occur until the next fiscal year, a memo suggesting that fair dealing under the contract would require at least notice of this switch, and then changed the method the very next quarter without providing notice. The basis of this switch was plaintiff's low collection rate, a factor the jury could find to have been due to defendant's own billing miscalculation. Finally, the evidence suggesting defendant's economic disarray provides the jury with a potential motive for defendant's acting with potential bad faith and unfair dealing.

Therefore, we grant plaintiff a new trial in which he would be given the benefit of the breach of good faith and fair dealing instruction.

## Evidentiary Issues

Plaintiff has assigned as error certain evidentiary determinations made by the trial court. We here address these briefly because they may arise at any new trial.

MAGLIONE v. AEGIS FAMILY HEALTH CTRS.

[168 N.C. App. 49 (2005)]

### I. Hearsay Exception—Rule 801(d) and Rule 403 Balancing

[3] Plaintiff contends the trial court erred in denying admission of the testimony of Dr. Jay Schmidt ("Dr. Schmidt"), another doctor employed by defendant, relating discussions Dr. Schmidt had with Dr. Huntsinger and Mr. Wooten. While we find the court erred in finding this testimony did not fit the hearsay exception under which it was offered, we cannot say the court abused its discretion in denying the evidence on the alternative basis that it was prejudicially misleading.

N.C. Gen. Stat. § 8C-1, Rule 801(d) (2003) provides for the following exception to the hearsay rule:

(d) Exception for Admissions by a Party-Opponent.—A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is . . . (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship[.]

N.C. Gen. Stat, § 8C-1, Rule 403 (2003) provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

At trial, offered under the hearsay exception, the court denied the testimony of Dr. Schmidt.

Dr. Schmidt was a doctor at Thompson employed under defendant's contract with the same PICP bonus program. His proffered *voir dire* testimony was the following:

Q Dr. Schmidt, what conversation did you have with Dr. Huntsinger about your bonus?

A At the time that he asked if I would work an extra month or two, uh, until the doctor that they had hired to replace me could start, I took the opportunity to check to make sure that the bonus that was due me would be paid. And because I was concerned at that time with the financial problems that [defendant] was in, and the fact that there were a number of people being laid off, and so on, I was concerned that there could be a problem with the bonus. And, he assured me sometime in early March, that there weren't gonna be any problems with the bonus being

paid out, as usual, according to the formula that had been used over the previous years.

Q  Early March of what year?

A  Of 2000.

Q  Did you inquire of [defendant], by the end of May of 2000—had you received any bonus payment for the quarter ending in March 31 of 2000?

A  No sir.

\*\*\*\*

Q  What did Mr. Wooten tell you about you[r] bonus for the quarter ending March 31 of 2000?

A  Well, he said that there wasn't gonna be one because the calculation to determine how the bonus was paid was being changed. And, uh, as it turned out with the new calculations, I was [sic] supposedly was not to receive a bonus.

Q  Prior to that conversation, had anyone in [defendant's] management told you that a change in the way that the bonuses were calculated were going to be made during that fiscal year?

A  No sir.

We believe that both the hearsay statements of Dr. Huntsinger and Mr. Wooten fall within the hearsay exception of Rule 801(d). These were party admissions made by agents of defendant and concerning the scope of their employment as CEO and director of financial management respectively. Though the admissions were not directly concerning plaintiff's own claims, they related to the terms of the same contract provisions plaintiff was disputing, governing the same time period, and were being offered for the truth of the matter asserted against defendant for breach of these express and implied terms.

However, after the court denied the admission of this testimony under Rule 801(d), the court went on to state:

[A]lso even if it were relevant I think it's, uh, would be so misleading under 403 it shouldn't be admitted, and that's another reason I'm not gonna allow it. In my discretion, okay?

When the court makes N.C. Gen. Stat. § 8C-1, Rule 403 finding that relevant evidence's probative value is substantially outweighed by its

unfair prejudice, we grant the court wide latitude in its discretionary determination and will reverse only for an abuse of discretion. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 463, 597 S.E.2d 674, 689 (2004) (citations omitted). We cannot say the court abused its discretion in this instance when such evidence could have confused the jury to find in favor of plaintiff based only on the evidence of defendant's actions and potential breach of their contract with Dr. Schmidt.

This assignment of error is overruled.

*II. Rebuttal Evidence*

**[4]** Plaintiff next contends the court erred in allowing defendant to cross-examine him concerning prior performance problems plaintiff had at another hospital. We do not agree.

"[T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself." *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981). When a party is allowed in the discretion of the trial court to introduce evidence of some relevance, "the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *Id.*; *see also State v. Walters*, 357 N.C. 68, 86-87, 588 S.E.2d 344, 355, *cert. denied*, —— U.S. ——, 157 L. Ed. 2d 320 (2003). As with an initial determination of relevant evidence, we grant the trial court great deference in its determination of relevant rebuttal evidence.

Presenting his case-in-chief, plaintiff was allowed to testify over defendant's objection for relevance, that his previous collection rate before working at Thompson was 68%. To rebut this testimony, cross-examination of plaintiff revealed that he had experienced performance problems in this prior position, including problems collecting for charges on medical tests because of insufficient medical documentation to justify the tests, and incidences of having left a room while severe stress inducing tests on patients' hearts were being conducted.

We cannot say the court erred in allowing this rebuttal evidence and this assignment of error is overruled.

*III. Relevancy*

**[5]** Lastly, plaintiff argues the court erred in its admission of evidence relating to defendant's reservations about hiring plaintiff, and

that plaintiff was offered an opportunity to remain in defendant's employment under certain conditions. Plaintiff argues this evidence was not relevant and prejudiced the jury. We do not agree.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2003). Although " 'the trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal.' " *Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (quoting *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991)).

In the case at bar, the trial court allowed the testimony that defendant had reservations about hiring plaintiff. We cannot say the court erred in finding this to be relevant. We believe it is of some relevance to rebut plaintiff's offered evidence of his high collection rate at a previous hospital and his generally successful cardiology practice.

The trial court also allowed the testimony that defendant offered plaintiff to continue his employment "as long as he was paid on actual receipts," and "took the risk of collections." We cannot say the court erred in finding this relevant. We believe this evidence is of some relevance to both the issues of defendant's attempt to mitigate any damages had the jury found defendant in breach, and it goes towards defendant's good faith and fair dealing for attempting to adhere to its interpretation of the employment contract terms.

In conclusion, we believe the court erred in failing to submit to the jury an instruction of the implied covenant of good faith and fair dealing. In addressing the evidentiary issues raised by plaintiff, we cannot say that at any new trial the court would be in error making the same determinations as the trial court did in this appeal.

New trial.

Judges TIMMONS-GOODSON and HUNTER concur.