Gay v. Peoples Bank, 2015 NCBC 59.

STATE OF NORTH CAROLINA

LINCOLN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 383

JOSEPH LEE GAY, Individually and on
Behalf of All Persons Similarly Situated,

Plaintiff,

v.

PEOPLES BANK,

Defendant.

ORDER AND OPINION

{1}　**THIS MATTER** is before the Court upon Defendant Peoples Bank's ("Defendant," "Peoples," or the "Bank") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Motion for Summary Judgment"); Plaintiff Joseph Lee Gay's ("Plaintiff") Motion for Permission to File Plaintiff's Supplement (the "Motion to Supplement"); and Defendant's Motion to Strike Plaintiff's Supplement in Further Opposition to Defendant's Motion for Summary Judgment (the "Motion to Strike") in the above-captioned case.

{2}　After considering the Motions, briefs in support of and in opposition to the Motions, the appropriate evidence of record, and the arguments of counsel at the March 4, 2015 hearing on this matter, the Court hereby **GRANTS** Plaintiff's Motion to Supplement, **DENIES** Defendant's Motion to Strike, and **GRANTS** Defendant's Motion for Summary Judgment.

> *Sigmon, Clark, Mackie, Hanvey & Ferrell, P.A. by Stephen L. Palmer; Squitieri & Fearon, LLP by Stephen J. Fearon, Jr.; and Greg Coleman Law PC by Greg Coleman for Plaintiff Joseph Lee Gay.*
>
> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Reid L. Phillips and Daniel F.E. Smith for Defendant Peoples Bank.*

Bledsoe, Judge.

## I.

## PROCEDURAL HISTORY

{3}     Plaintiff alleges claims, both individually and purportedly on behalf of a class of similarly situated persons, arising out of certain overdraft fees incurred by Plaintiff and other of Defendant's customers between June 6, 2008 and July 1, 2011.[1] Plaintiff's claims are specifically focused on multiple overdraft fees incurred on a single banking day by Plaintiff and other customers as a result of Defendant's high-to-low posting of ATM and one-time, non-recurring, debit card transactions, which Plaintiff contends Defendant did not properly disclose in an effort to derive excessive overdraft fee income at the expense of unsuspecting customers.  Plaintiff's core contention is that Defendant manipulated the timing and order in which customer debit charges were processed – without notice to customers and in violation of Defendant's contract obligations to its customers – to charge overdraft fees on accounts that were not actually overdrawn.

{4}     Defendant contends that, unlike certain large national banks sued in other class actions around the United States with whom Plaintiff compares Defendant, Defendant always disclosed to its customers that it paid transactions in high-to-low order during the time period at issue and always posted credits to its customers' accounts before posting debits.  Defendant asserts that Defendant fully complied with the terms of its applicable agreements with Plaintiff and other Bank customers and that Plaintiff's claims represent an improper attempt to shift responsibility for managing Plaintiff's account to avoid overdrafts from Plaintiff to Defendant.

{5}     Plaintiff filed his Class Action Complaint on March 25, 2013, in Lincoln County Superior Court, asserting claims against Defendant for breach of contract, breach of the covenant of good faith and fair dealing, conversion, unjust enrichment, and unfair and deceptive trade practices under N.C. Gen. Stat. §§ 75-1.1, et seq. ("UDTP").

---

[1] The termination date for the class period appears somewhat unclear and may also be July 1, 2010 or August 15, 2010.  A determination of the end date for the class period is not necessary to resolve Defendant's Motion.

{6} On October 24, 2014, Defendant filed its Motion for Summary Judgment.[2] Plaintiff filed his Response to the Motion for Summary Judgment on December 10, 2014 and Defendant filed its Reply to Plaintiff's Response on December 23, 2014.

{7} On February 16, 2015, Plaintiff filed a Supplement in Further Opposition to Defendant's Motion for Summary Judgment (the "Supplement"). The next day, Defendant filed its Objection and Motion to Strike Plaintiff's Supplement. Plaintiff subsequently filed his Motion to Supplement on February 27, 2015.

{8} The Court held a hearing on the Motions on March 14, 2015, at which all parties were represented by counsel. The Motions are now ripe for resolution.

II.

FACTUAL BACKGROUND

{9} While findings of fact are not necessary or proper on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010). Therefore, the Court limits its factual recitation to the undisputed material facts necessary to decide the Motions, and not to resolve issues of material fact.

{10} Plaintiff Joseph Lee Gay is a resident of Lincolnton, North Carolina, and maintained a checking account with Peoples Bank at all times relevant to this action. (Compl. ¶ 9.)

{11} Defendant Peoples Bank is a North Carolina corporation that provides retail banking services to thousands of customers at approximately 22 branches in North Carolina. (Compl. ¶ 2.)

{12} The Bank's services include issuing debit cards, which allow the Bank's customers to transact with third parties using funds paid directly from their checking

---

[2] Although Defendant moved for summary judgment prior to the close of the discovery period, Rule 56 expressly provides that a party may move for summary judgment "at any time after the expiration of 30 days from the commencement of the action or after service of motion for summary judgment," N.C. R. Civ. P. 56(b), and Plaintiff has not filed an affidavit as permitted under Rule 56(f) stating that "he cannot for reasons stated present by affidavit facts essential to justify his opposition," N.C. R. Civ. P. 56(f). Accordingly, contrary to Plaintiff's contention that Defendant's Motion is "premature," (Pl.'s Resp. Def.'s Mot. Summ. J., p. 8), the Court finds no procedural impediment to its consideration of Defendant's Motion for Summary Judgment on the record here.

accounts, and issuing automatic teller machine ("ATM") cards, which allow the Bank's customers to withdraw cash directly from their accounts at ATMs. These debit card and ATM transactions are generally referred to as "electronic debit transactions." (Compl. ¶¶ 2–3, 38–39.)

{13} Since December 8, 1999, Peoples Bank has processed electronic debit transactions from the highest to lowest dollar amount. (Def.'s Br. Supp. Mot. Summ. J., p. 13–14; Pl.'s Resp. Def.'s Mot. Summ. J., p. 1.)

{14} On July 3, 2008, Plaintiff opened an account at the Bank, at which time Plaintiff agreed to and received the following documents: (i) the Terms and Conditions of the Account Agreement ("Terms and Conditions"); (ii) an Addendum to the Terms and Conditions ("Terms and Conditions Addendum"); (iii) a Funds Availability disclosure (per Regulation CC); (iv) Electronic Funds Transfers Disclosures, Peoples Bank 24 Express, & Peoples Bank 24 Express Check Terms, Conditions and Agreements ("ETF Agreements"); (v) a truth-in-savings disclosure (per Regulation DD); (vi) a No Bounce Advantage (overdraft program) disclosure;[3] and (vii) a privacy disclosure (per Regulation P) (collectively, the "Account Agreement Documents"). (Connie Ollis Aff., ¶¶ 13, 14; Ans. Ex. 8.)[4]

{15} On September 14, 2009, Plaintiff was charged multiple overdraft fees for the payment of ATM and/or one-time debit card transactions from his Peoples Bank checking account. Peoples Bank assessed Plaintiff's account eleven (11) insufficient funds charges of $33 each for a total charge of $363. (Compl. ¶ 9.)

---

[3] The No Bounce Advantage product was marketed to Defendant by Pinnacle Financial Services, Inc. ("Pinnacle") and allows Bank customers to overdraw their accounts. The customer is required to pay fees for excessive overdrafts but benefits from having additional spending power, not incurring returned check fees, avoiding negative credit history impacts, and avoiding embarrassment from dishonored or rejected transactions. (Kim Bazzle Dep. 35, 100–01.) Although Plaintiff argues that "Peoples retained Pinnacle to increase revenue dramatically" and paid Pinnacle based on additional overdraft fees generated, (Pl.'s Resp. Def.'s Mot. Summ. J., p. 1), there is no evidence that Pinnacle influenced the Bank's decision to post transactions in high-to-low order or that Pinnacle's product controlled the Bank's high-to-low posting. (Gillen Dep. 29, 32, 60.)

[4] Defendant typically provided each of these documents to each customer opening an account at the Bank during this same time period. (Ollis Aff. ¶ 13.)

{16}     On September 18, 2009, Peoples Bank refunded nine (9) of the eleven (11) overdraft fees incurred by Plaintiff.  (Def.'s Br. Supp. Mot. Summ. J., p. 9.)

{17}    The following allegations form the basis of Plaintiff's claims against Peoples Bank:

a. "The [A]ccount [A]greement [Documents] failed to disclose the Bank's policy to *always* reorder debits from highest dollar value to lowest. Moreover, the Account Agreement [Documents] failed to disclose that Peoples would process debits to a customer's account before processing credits in order to maximize overdrafts, and that the Bank delayed posting certain transactions, or processed them ahead of, or behind, transactions from different days, in order to post multiple debits on a single day and maximize overdrafts on that day.  Thus the Account Agreement [Documents] failed to disclose that Peoples reordering practices would allow the Bank to maximize the number of overdrafts on any account, and to assess overdraft fees for days when a customer's account was not actually overdrawn (but for the Bank's reordering)." (Compl. ¶ 43) (emphasis in original).

b. "Peoples failed to disclose that it would charge overdraft fees when customer accounts had a positive balance and were not overdrawn.  The Account Agreement [Documents] failed to disclose the Bank's wrongful practices relating to its reordering of debit transactions and imposing overdraft fees from debit card purchases and ATM withdrawals.  As described herein, Peoples did not debit customer accounts immediately at the time of purchase in the amount of that purchase only, and Peoples reordered transactions from different days for its own benefit, to the customer's detriment." (Compl. ¶ 44.)

c. "Peoples representations were deceptive and unfair because it was, in fact, the Bank's policy and practice during the Class Period to *always* reorder debits from highest dollar value to lowest, and because the Bank grouped together point of sale transactions that occurred on subsequent

days with those transactions that occurred on earlier days, and reordered them so that debits were processed before credits and higher debits that occurred on subsequent days were posted to its customers' accounts before lower debits that occurred on earlier days." (Compl. ¶ 45) (emphasis in original).

d. "Even if Plaintiff was given materials containing clear and unambiguous language disclosing or authorizing the Bank's practices as described above, any such notice or authorization would have been inadequate and ineffective. Furthermore, any reservation of discretion to reorder transactions and assess overdraft fees would be constrained by Peoples's obligation to deal fairly and in good faith." (Compl. ¶ 47.)

III.

LEGAL STANDARD

{18} Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. Rule 56(c) (2015). "A movant may meet its burden by showing either that: (1) an essential element of the non-movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the [non-]movant cannot surmount an affirmative defense which would bar the claim." *McKinnon v. CV Indus.*, 213 N.C. App. 328, 332, 713 S.E.2d 495, 499 (2011) (citations and internal quotation marks omitted). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Whitley v. Cubberly*, 24 N.C. App. 204, 206, 210 S.E.2d 389, 291 (1974); *See generally McKee v. James*, 2014 NCBC 73 ¶ 31 (N.C. Super. Ct. Dec. 31, 2014), www.ncbusinesscourt.net/opinions/2014_NCBC_73.pdf (discussing standard).

IV.

ANALYSIS

A. <u>Plaintiff's Motion to Supplement and Defendant's Motion to Strike</u>

{19}   Based on the particular procedural facts here – and without intending to create a rule of general application and without prejudice to future challenges under Business Court Rule 15.6 concerning response briefs in this case – the Court elects, in its discretion, to consider all the arguments presented in Plaintiff's Supplement in considering Defendant's Motion for Summary Judgment.  Accordingly, the Court determines that Defendants' Motion to Strike should be denied and Plaintiff's Motion to Supplement should be granted.

B. <u>Defendant's Motion for Summary Judgment</u>

{20}   As an initial matter, Plaintiff contends that Defendant's Motion should be denied because Judge Murphy rejected Defendant's contract-based arguments in denying Defendant's Motion for Judgment on the Pleadings under Rule 12(c).  (Pl.'s Resp. Def.'s Mot. Summ. J., p. 8.)  North Carolina law is clear, however, that "denial of a previous motion for judgment on the pleadings made under N.C. Gen. Stat. § 1A-1, Rule 12(c) (2003) does not preclude the trial court from granting a subsequent motion for summary judgment." *Rhue v. Pace*, 165 N.C. App. 423, 426, 598 S.E.2d 662, 664–65 (2004).  Moreover, it is undisputed that Defendant has relied upon certain evidence that was not before Judge Murphy on Defendant's Rule 12(c) Motion to support Defendant's Motion for Summary Judgment, providing further basis for the Court to re-examine Defendant's arguments under the standards of Rule 56.[5] Accordingly, the Court rejects Plaintiff's contention that the Court is bound on this Motion by Judge Murphy's interpretation of the Account Agreement Documents in resolving Defendant's Motion for Judgment on the Pleadings.

---

[5] In particular, Defendant has offered the following evidence that was not before Judge Murphy on Defendant's Rule 12(c) motion: a 2008 No Bounce Advantage brochure and disclosure document; undisputed evidence that one of the Terms and Conditions Addenda relied upon by Judge Murphy in denying Defendants' Rule 12(c) motion was not implemented until July 1, 2011 and did not apply during the period at issue; and undisputed affidavit testimony seeking to establish that an approved debit card transaction may not be returned by the Bank. (Def.'s Br. Supp. Mot. Summ. J., p. 15.)

i.    Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

{21}   "Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts." *McKinnon,* 213 N.C. App. at 333, 713 S.E.2d at 500.  "[I]f the meaning of the [contract] is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Woods v. Nationwide Mut. Ins. Co.,* 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978).  Furthermore, the Court must "construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so." *Johnston Cnty. v. R.N. Rouse & Co.,* 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992) (citations omitted).

a.   Breach of Contract: High-to-Low Posting

{22}   As noted previously, it is undisputed that People's Bank used a high-to-low posting order for debit transactions throughout the relevant period.  (Def.'s Br. Supp. Mot. for Summ. J., p. 13; Pl.'s Resp. Def.'s Mot. Summ. J., p. 1.)  Plaintiff alleges that Peoples Bank's policy of paying debit card transactions from highest dollar value to lowest was inconsistent with the terms of the Account Agreement Documents, constitutes a breach of contract, and was undertaken to maximize the number of the Bank's overdraft charges – and hence the Bank's profits – at the expense of Plaintiff and other Bank customers.  (Compl. ¶ 85.)

{23}   The Terms and Conditions Addendum provides in relevant part as follows:

> **Payment Order of Items** - The law permits us to pay items (such as checks or drafts) drawn on your account in any order. To assist you in handling your account with us, we are providing you with the following information regarding how we process the items that you write. *When processing items drawn on your account, our policy is to pay them according to the dollar amount. We pay the largest items first.* The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. *Our payment policy will cause your largest, and perhaps more important, items to be paid first . . . , but may increase the overdraft or NSF fees you have to pay if funds are not available to pay all of the items. If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item*

*(creating an overdraft) or return the item (NSF).* The amounts of the overdraft and NSF fees are disclosed elsewhere.

(Ans. Ex. 3; *see* Pl.'s Resp. Def.'s 1st Requests for Admission, no. 4) (emphasis added).

{24} The relevant portion of the Terms and Conditions Addendum therefore clearly stated that Peoples Bank processed "items" from largest to smallest, and authorized overdraft fees for "items" drawn on insufficient funds. (Ans. Ex. 3.) The Terms and Conditions document also expressly provided that the customer "agree[s] that we may charge fees for overdrafts and use subsequent deposits . . . to cover such overdrafts and overdraft fees." (Ans. Ex. 2, pp. 1, 3.) Plaintiff accepted the terms of the governing documents when he signed the Account Agreement Documents and used Defendant's banking services.

{25} Plaintiff's primary argument focuses on the first sentence of the Terms and Conditions Addendum: "The law permits us to pay items (such as checks or drafts) drawn on your account in any order." Plaintiff argues that the term "item," as used here, does not include debit transactions and that, as a result, Defendant's high-to-low posting of debits was not permitted and not disclosed. Plaintiff bases his argument on his belief that Defendant's use of the parenthetical "such as checks or drafts" to describe "items," coupled with the fact that the EFT Agreements specifically reference debits without discussing the high-to-low posting order, shows that the high-to-low posting order stated in the Terms and Conditions Addendum did not apply to debit transactions. The Court finds Plaintiff's argument unpersuasive.

{26} "An ambiguity exists where the 'language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties.'" *Myers v. Myers*, 213 N.C. App. 171, 175, 714 S.E.2d 194, 198 (2011). The law is clear, however, that the Court will not read an ambiguity into a contract where none exists. *See Henderson v. United States Fid. & Guar. Co.*, 124 N.C. App. 103, 107, 476 S.E.2d 459, 461 (1996) ("Where, however, no ambiguity exists, the court may not rewrite the contract and find coverage where none was contracted for."). Moreover, our courts have long held that "[p]arties can differ as to the interpretation of language without

its being ambiguous." *Walton v. City of Raleigh*, 342 N.C. 879, 881–82, 467 S.E.2d 410, 412 (1996).

{27}    Applying these principles here, the Court concludes that Defendant's use of the phrase "such as checks or drafts" in this specific context is an unambiguous phrase of inclusion and not an exhaustive list of the specific "items" embraced by the Bank's policy. In particular, the Court finds the phrase "such as," as used here, to be synonymous with "for example," "for instance," or "like" and to identify "checks or drafts" as an illustration of two types of transfers the Bank may pay as provided in the policy statement.

{28}    Moreover, the Court further concludes that the term "item," as used here, plainly contemplates any debit to an account – whether by check, draft, ACH payment, wire, online, mobile device, voice response, debit transaction or other withdrawal. This reading is not only supported by the "plain, ordinary and popular" use of the word "item" – *see Webster's Third New International Dictionary, Unabridged* (2002) (defining "item" variously as "each of the separate credits or debits detailed in a book of account")[6] – but also by the way the term is used in the Account Agreement Documents. For example, the Court reads the EFT Agreements to include debit card transactions as an "item" (referencing "failure to pay 'other items' drawn on [a] checking account"), (Ans., Ex. 5 ¶ 13(b) at p. 5), as well as the No Bounce Advantage disclosure (requesting "check number (if applicable)" concerning an "item" and referencing the "order of item payment" in discussing "electronic transactions") (Second Ollis Aff. Ex. F.) The fact that the Account Agreement Documents do not expressly state that an "item" includes an "electronic debit transaction" does not create ambiguity where, as here, the plain meaning of the term can be discerned by reference to the relevant documents. *See RL Regi N.C., LLC v. Lighthouse Cove, LLC*, 367 N.C. 425, 428, 762 S.E.2d 188, 190 (2014) ("Applying contract principles, we determine the intent of the parties by the plain meaning of the written terms."); *see*

---

[6] *See also Black's Law Dictionary*, 5th Ed., (1979) (defining "item" variously as "[a] separate entry in an account or a schedule, or a separate particular in an enumeration of a total."); *Black's Law Dictionary*, 8th Ed., (1999) (defining "item" as "[a] negotiable instrument or a promise or order to pay money handled by a bank for collection or payment.").

*also Lee v. Scarborough*, 164 N.C. App. 357, 360, 595 S.E.2d 729, 732 (2004) ("[T]he clear intent of the parties as expressed on the face of the contract controls."); *Brawley v. Brawley*, 87 N.C. App. 545, 549, 361 S.E.2d 759, 762 (1987) ("[W]here the language used in the contract is clear and unambiguous, the intention of the parties is to be gathered from the face of the contract.").

{29} Having concluded that electronic debit transactions are included within the term "items" under the Terms and Conditions Addendum and the other Account Agreement Documents, the plain language of the Addendum compels the conclusion that the Bank retained the right to pay, and disclosed to the Bank's customers that the Bank would pay, debit transactions in high-to-low order during the time period at issue. (*See* Ans. Ex. 3 ("When processing items drawn on your account, our policy is to pay them according to the dollar amount. We pay the largest items first.").)

{30} The Court finds further support for its reading in the language of the No Bounce Advantage disclosure stating that "[i]n the normal course of business, we generally pay electronic transactions first and then checks beginning with the highest dollar amount, per the bank's policy"[7] and warning customers to "be aware that the order of item payment may create multiple overdrafts during a single banking day for which you will be charged our paid item NSF fee of $33 for each overdraft paid." (Ollis Second Aff. Ex. E) (emphasis added).[8]

{31} When read and considered together, the Court finds that the language describing the payment priority of electronic debit transactions in the Account Agreement Documents generally, and in the Terms and Conditions Addendum specifically, is unambiguous and clearly discloses Defendant's policy to pay electronic

---

[7] Plaintiff contends that, as used here, the phrase "beginning with the highest dollar amount" relates to "checks" and not to "electronic transactions," and that, at a minimum, the sentence creates ambiguity concerning the payment of electronic transactions. Although the use of commas in the sentence could have provided more clarity, the Court concludes that the phrase "per the bank's policy" removes any ambiguity and makes clear that, consistent with the Bank's policy as set out in the Terms and Conditions Addendum, the Bank paid electronic transactions first, in high-to-low priority.

[8] The Account Agreement Documents did not impose any duty on Defendant to notify a Bank customer before the Bank paid or returned any item.

transactions before checks, with high-to-low posting, and to permit the assessment of a bank overdraft fee for debit transactions drawn on insufficient funds. Given that the evidence is undisputed that Defendant followed this policy during the relevant time period, the Court concludes that Plaintiff's breach of contract claim on this ground should be dismissed.[9]

        b.  <u>Breach of Contract: Chronological or Immediate Posting</u>.

{32}   Next, Plaintiff contends that Defendant breached the terms of the Account Agreement Documents because it did not debit customers' accounts immediately at the time of purchase. Plaintiff offers support for his position by first pointing to a statement in the EFT Agreements that a debit transaction "will constitute a simultaneous withdrawal from and/or demand from your checking account." (Pl.'s Resp. Def.'s Mot. Summ. J., p. 9; Ans. Ex. 5 ¶ 13a.) Plaintiff also points to a statement in the EFT Agreements that the customer "should treat all banking card transactions as immediate withdrawals from [the customer's] account and reflect them as such in [the customer's] personal records," (Ans. Ex. 5) as further evidence that Defendant was obligated to debit a customer's account chronologically or immediately at the time of purchase. (Pl.'s Resp. Def.'s Mot. Summ. J., p. 9.) Plaintiff's argument fails, however, when these statements are considered in context and the EFT Agreements are considered as a whole.

{33}   First, the statement advising customers that debit transactions will constitute a simultaneous withdrawal is followed in the very same sentence by the phrase "even though the transaction may not actually be posted to that account," (Ans. Ex. 5), negating any obligation of chronological or immediate posting by the Bank. The Court thus does not find support for Plaintiff's contention that "simultaneous withdrawal" in this context means "instantaneous" or "chronological" posting.

---

[9] Although Plaintiff contends that the Bank posted debits before credits and thus acted in breach of the Account Agreement Documents, as explained more fully *infra* at pp. 13–15, Plaintiff fails to identify any competent evidence that would permit a reasonable factfinder to agree with Plaintiff's claim. (*See also, e.g.*, Punch Dep. 45; Punch Aff. ¶ 21.)

{34} Similarly, the admonition that customers "should treat all banking card transactions as immediate withdrawals" is followed later in the EFT Agreements by the customer's express agreement "to assume responsibility for all authorized transactions arising from the use of the ATM or debit card." Not only is the "should treat" language here exhortative and directed to the customer's activities — not the Bank's — but, read in context, is intended to advise the customer that he must keep track of his account activity if he is to avoid overdrafts and overdraft charges. This reading is further supported by the Bank's statement to customers that overdraft services "should not be viewed as an encouragement to overdraw your account," (Ollis Aff. Exs. E–G; Ans. Ex. 7, p. 4), and the Bank's various admonitions in the Account Agreement Documents that the "best way to avoid overdraft fees is to manage your account so you don't overdraw it," "keep track of [the] account balance by entering all items in [a] check register," and reconcile the account regularly. (Ollis Aff. Exs. E–G; Ans. Ex. 7, p. 4.)[10]

{35} Based on the foregoing, the Court concludes that the undisputed evidence of record shows that Defendant did not have an obligation to post debits to customers' accounts chronologically or immediately at the time of purchase under the EFT Agreements or any of the other Account Agreement Documents. As a result, Plaintiff's claim for breach of contract on this basis should be dismissed.

c.     Breach of Contract: Overdraft Charge When Not Overdrawn

{36} Plaintiff also argues that Defendant did not disclose it would charge overdraft fees when customer accounts had a positive balance and were not overdrawn and that its conduct in doing so breached Defendant's contract with Plaintiff. Plaintiff, however, has presented no evidence from which the Court could conclude that Defendant charged an overdraft fee to Plaintiff's account when Plaintiff's account had a positive balance and was not overdrawn. Indeed, although Plaintiff contends that the monthly account statements he received from the Bank

---

[10] Similarly, in addressing Plaintiff's uncle's allegations of improper overdraft fees at Peoples Bank, the Federal Deposit Insurance Corporation ("FDIC") stated that "[i]n order to assist consumers, the FDIC recommends consumers use a check register to keep a record of all purchases and preauthorized transactions that will be processed through their checking account." (Ollis Aff. Ex. I.)

reflect numerous instances of the Bank charging an overdraft fee before his account was actually overdrawn, the undisputed testimony shows that the Bank's monthly statements did not reflect "real-time" posting or set forth a "running balance" on a customer's account, were not intended to communicate specific overdraft information to the Bank's customers, and instead simply listed, by date, all of the transactions that occurred on a customer's account on a given business or banking day. (*See, e.g.,* Ollis Dep. 153, 156–62.) The Bank's policy and practice was to provide a separate Notice of Insufficient Funds document to Plaintiff and other customers to show which specific transactions caused each overdraft charge that had been incurred. (*See, e.g.,* Anthony Wolfe Dep. 208–09.) Plaintiff has not brought forward evidence to rebut or dispute the Bank's contention that it is the Notice of Insufficient Funds document that communicates Plaintiff's account balance at the time an overdraft fee is incurred, nor has Plaintiff presented a Notice of Insufficient Funds document or other evidence that demonstrates that the Bank charged Plaintiff an overdraft fee when his account had a positive balance. As a result, the Court concludes that Plaintiff has failed to bring forward sufficient evidence to sustain his claim for breach of contract on this theory.

{37} Plaintiff also contends that "the Bank grouped together point of sale transactions that occurred on subsequent days with those transactions that occurred on earlier days, and reordered them so that debits were processed before credits and higher debits that occurred on subsequent days were posted to its customers' accounts before lower debits that occurred on earlier days." (Compl. ¶ 45.) The evidence is undisputed, however, that when Plaintiff or another customer presented an item for payment without sufficient funds, the Bank's policy and practice was for Bank personnel to decide whether to pay or return the item on the next business or banking day. (Ollis Dep. 163; Def.'s Resp. to Second Set of Interrogs. No. 3.) Thus, the evidence Plaintiff offers in support of his contention – an overdraft item presented on a Friday with the customer's monthly account statement not reflecting an overdraft charge until the following Monday (i.e., the next banking day) – is not an example of the Bank reordering transactions over several days to assess an overdraft fee on what

would otherwise be a positive account balance. Rather, Plaintiff's evidence merely reflects the Bank's policy and practice in operation – an overdraft item presented on a Friday with the monthly statement reflecting the Bank's decision on the following Monday to pay the item and assess an overcharge fee. Moreover, the evidence is undisputed that the Bank could only process a customer's debit transactions with a vendor after the Bank received a request for payment from the vendor. Although Plaintiff suggests that the Bank reordered such transactions to assess excessive overdraft fees, it is undisputed that the "delayed" charges Plaintiff identifies resulted from the Bank not receiving a vendor's request for payment until a day or two after the point-of-sale transactions, not because of an attempt to reorder the transactions to create an opportunity to assess fees when no fees could be properly charged. In short, the Notice of Insufficient Funds document makes clear which items caused each overdraft fee, and Plaintiff has failed to show any evidence that the Bank posted debits before credits or charged an overdraft fee on a positive account balance.

{38} Based on the foregoing, the Court concludes that Plaintiff has failed to bring forward evidence to show that Defendant failed to comply with the terms contained in the various disclosures, addendums, and forms that constituted the Account Agreement Documents. Consequently, the Court finds that Plaintiff's claim for breach of contract should be dismissed.

### d. Implied Covenant of Good Faith and Fair Dealing

{39} North Carolina law provides that in every contract, in addition to its express terms, "there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 251, 567 S.E.2d 781, 789 (2002) (citation omitted) (internal quotation marks omitted); *see, e.g., Hamm v. Blue Cross & Blue Shield of N.C.*, 2010 NCBC 14 ¶ 80 (N.C. Super. Ct. Aug. 27, 2010), www.ncbusinesscourt.net/opinions/2010_NCBC_14.pdf (noting good faith and fair dealing claim "requires the wrongful intent of a party to deprive another party of its contractual rights."). Moreover, our courts have held that "[a] contract . . . encompasses not only its express provisions but also all such implied

provisions as are necessary to effect the intention of the parties unless express terms prevent such inclusion." *Lane v. Scarborough*, 284 N.C. 407, 410, 200 S.E.2d 622, 624 (1973); *see, e.g.*, *Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) ("In addition to its express terms, a contract contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms.") (quotations and citations omitted).

{40}    Plaintiff alleges that Defendant breached the covenant of good faith and fair dealing here when it failed to exercise its discretion properly under the Account Agreement Documents in paying transactions or returning them for insufficient funds ("NSF").  Specifically, Plaintiff argues that Defendant should have refused to pay any NSF items and thereby prevented Plaintiff's account from becoming overdrawn and subject to overdraft fees. (Pl.'s Resp. Def.'s Mot. Summ. J., p. 8–9.) The language in the Account Agreement Documents is clear, however, that Defendant was under no obligation to return items NSF and instead had the right to pay or return items in the event of an overdraft in the exercise of its sole discretion.  (*See* Ans. Ex. 3 ("If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF).").)  Plaintiff's claim therefore asks the Court to impose an implied term – requiring Defendant to always return and not pay NSF items – that is contrary to the express terms of the Account Agreement Documents.  This the Court may not do. *See, e.g.*, *Lane*, 284 N.C. at 410, 200 S.E.2d at 624 (implying contract terms only if they do not conflict with express terms); *Maglione*, 168 N.C. App. at 56, 607 S.E.2d at 291 (same).

{41}    Moreover, Plaintiff has not brought forward any evidence to suggest that the parties intended that the Bank would always exercise its discretion to refuse to pay NSF items as Plaintiff contends the Bank should have done here.  As a result, Plaintiff has failed to show that the implied term Plaintiff argues for "effects the intention of the parties," *Lane*, 284 N.C. at 410, 200 S.E.2d at 624, or otherwise "accomplishes the purposes of the [agreement]," *Maglione*, 168 N.C. App. at 56, 607 S.E.2d at 291 ("All parties to a contract must act upon principles of good faith and

fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose.").

{42}    Based on the foregoing, the Court concludes that Plaintiff has failed to show that he has been deprived of any rights or benefits under the Account Agreement Documents, and therefore, that Plaintiff's claim for breach of the covenant of good faith and fair dealing should be dismissed. *See, e.g.*, *Governor's Club Inc.*, 152 N.C. App. at 251, 567 S.E.2d at 789; *see also Suntrust Bank v. Bryant/Sutphin Prop., LLC*, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012) ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts.").

ii.    Conversion

{43}    "[C]onversion is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.,* 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008) (internal citations omitted). A plaintiff must prove two essential elements to establish a conversion claim under North Carolina law: (1) ownership in the plaintiff, and (2) a wrongful possession or conversion by the defendant. *Id.; Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act." *Lake Mary L.P. v. Johnston*, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (2001); *Bartlett Milling Co. L.P. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008).

{44}    In this case, Plaintiff does not challenge Defendant's general right to charge overdraft fees but nonetheless argues that "Peoples has wrongly collected overdraft fees from Plaintiff" as a result of its manipulation and posting of debit card

transactions and continues to exercise "the right of ownership over these funds in hostility to the rights of Plaintiff." (Compl. ¶¶ 94–96.) The Court, however, has already concluded that the Account Agreement Documents authorized the Bank to charge overdraft fees to Plaintiff and other Bank customers, Defendant was within its rights to charge overdraft fees based on the high-to-low posting of debits, (Ans. Exs. 1–2, 5), and Plaintiff has not shown that Defendant failed to comply with the Account Agreement Documents in assessing overdraft fees against Plaintiff. As a result, the Court concludes that Plaintiff has not brought forward evidence of Defendant's wrongful possession or conversion of Plaintiff's property, and Plaintiff's conversion claim should therefore be dismissed.

### iii. Unjust Enrichment

{45} When a party "confers a benefit upon another which is not required by a contract either express or implied or a legal duty, the recipient thereof is often unjustly enriched and will be required to make restitution therefor." *Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 184 N.C. App. 688, 695–96, 647 S.E.2d 111, 116 (2007). However, "[o]nly in the absence of an express agreement of the parties will courts impose a quasi-contract or a contract implied in law in order to prevent an unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998); *see, e.g., Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1998) (rejecting unjust enrichment claim and holding that "[i]f there is a contract between the parties, the contract governs the claim and the law will not imply a contract"); *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962) (holding that "[i]t is a [well-established] principle that an express contract precludes an implied contract with reference to the same matter"). Because the Court has concluded that the express terms of the Account Agreement Documents permit Defendant to assess the overdraft fees it charged to Plaintiff here, Plaintiff's unjust enrichment claim must therefore be dismissed.

iv.    Unfair and Deceptive Trade Practices N.C. Gen. Stat. §§75-1.1, et seq.

{46}    The issue of whether an act or practice is unfair or deceptive is a question of law for the court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56, 714 S.E.2d 162, 167 (2011). To prevail on a UDTP claim under N.C. Gen. Stat. § 75-1.1, Plaintiff must demonstrate: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business." *Dalton v. Camp*, 138 N.C. App. 201, 209, 531 S.E.2d 258, 264, *rev'd on other grounds*, 353 N.C. 647, 548 S.E.2d 704 (2001) (internal citation omitted). "'A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and a 'practice is deceptive if it has the capacity or tendency to deceive.'" *Bumpers v. Cmty. Bank of Va.,* 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) (internal citations omitted).

{47}    Plaintiff argues that Defendant violated the UDTPA "by misrepresenting to customers that debits were posted chronologically and by victimizing customers to maximize unauthorized fees." (Pl.'s Resp. Def.'s Mot. Summ. J., p. 19.) Plaintiff's claim must be dismissed for at least two reasons.

{48}    First, it is undisputed that the Bank processed debit transactions in high-to-low priority during the relevant period, and the Court has already concluded that Defendant disclosed to customers in the Account Agreement Documents that the Bank processed large debits first and, in its discretion, assessed overdraft fees for transactions drawn on insufficient funds. Hence, Plaintiff has failed to bring forward evidence showing that Defendant "misrepresent[ed] to customers that debits were posted chronologically" or otherwise engaged in conduct that violated its obligations under the Account Agreement Documents.[11] Noel L. Allen, 1 *North Carolina Unfair*

---

[11] Although Plaintiff seeks to equate Defendant's actions here with the actions of other banks whose practices have been deemed unlawful, the Court finds Plaintiff's comparisons unpersuasive. For example, in *Gutierrez v. Wells Fargo Bank, N.A.*, 622 F. Supp. 2d 946, 954 (N.D. Cal. 2009), a case relied upon by Plaintiff, the bank's policy, unlike Defendant's here, was to "post items presented against the Account in any order the Bank chooses . . . ." Similarly, in *Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 676 (D. N.J. 2012), another case relied upon by Plaintiff and again unlike here, the bank informed customers that "[w]e may choose our processing orders in our sole discretion and

*Business Practice* § 19.04[2][b] (Matthew Bender 2014) ("Although it may seem obvious, a party's actions that conform with the terms of a contract have not been considered an unfair trade practice."). Further, Plaintiff does not otherwise offer evidence – independent from conduct permitted by contract – to support his claim that Defendant has violated N.C. Gen. Stat. § 75-1.1. *See, e.g., Gaynoe v. First Union Corp.*, 153 N.C. App. 750, 755, 571 S.E.2d 24, 27 (2002) ("Since we have concluded that defendants acted in accordance with the cardholder agreement, a careful review of the record does not establish independent grounds for a [UDTP claim].").

{49} Second, while Plaintiff claims Defendant should have declined the transactions that would draw on insufficient funds, the record discloses that Defendant was not obligated to refrain from drawing on insufficient funds in the event of an overdraft, (Ans. Ex. 3), and further that Plaintiff was notified of the procedure to remove the overdraft (i.e., "No Bounce") protection from his account, which would have prevented those items from being paid by the Bank, yet never exercised this option. Furthermore, it is certainly relevant that Plaintiff was the purchaser initiating the transactions at issue and the holder and user of his debit card. It cannot be disputed that he was in the best position to prevent items from being paid when there was not enough money in his account to cover them. That Plaintiff failed to manage and reconcile his account to avoid these charges in the circumstances here does not provide grounds for a UDTP claim.

{50} For the reasons set forth above, the Court concludes that Plaintiff has not brought forward sufficient evidence to permit his UDTP claim to survive Defendant's motion for summary judgment.

---

without notice to you, regardless of whether additional fees may result." The Court does not find either case to present circumstances analogous to those here. Moreover, it appears undisputed that unlike other banks referenced by Plaintiff, Defendant always posted credits to a customer's account before posting debits to that account, (Puntch Dep. 45; Puntch Aff. ¶ 21); has not commingled transactions to increase overdraft fees, (Puntch Dep. 43; Puntch Aff. ¶¶ 19–22); and has never subtracted fees before processing a customer's transaction, (Puntch Dep. 56).

V.

CONCLUSION

{51}  Based on the foregoing, the Court hereby **GRANTS** Plaintiff's Motion for Permission to File Plaintiff's Supplement, **DENIES** Defendant's Motion to Strike Plaintiff's Supplement, and **GRANTS** Defendant's Motion for Summary Judgment on all claims.  Accordingly, Plaintiff's Complaint and all claims contained therein is hereby **DISMISSED** with prejudice.[12]


        **SO ORDERED**, this the 10th day of June 2015.


                                    /s/ Louis A. Bledsoe, III
                                    Louis A. Bledsoe, III
                                    Special Superior Court Judge
                                     for Complex Business Cases

---

[12] Defendant also moves for dismissal of Plaintiff's Complaint under Rule 56 on grounds of laches and waiver.  The Court declines to reach Defendant's arguments in light of the Court's resolution of Defendant's Motion on the grounds stated.