Londry v. Stream Realty Partners, L.P., 2025 NCBC 31.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23CVS012833-590

JARED RAYMOND LONDRY and
POINTBLANK VENTURES, LLC,

Plaintiffs,

v.

STREAM REALTY PARTNERS,
L.P., STREAM REALTY
PARTNERS-CHARLOTTE, L.P.,
and DANIEL FARRAR,

Defendants.

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1.    **THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Defendants' Motion), (ECF No. 42), and Plaintiffs' Motion for Partial Summary Judgment (Plaintiffs' Motion), (ECF No. 44), (collectively, the Motions).

2.    In 2020, Plaintiff Jared Raymond Londry (Londry) accepted employment as a real estate broker with Stream Realty Partners-Charlotte, L.P. (Stream Charlotte). He contends that he became a limited partner in the firm. Defendants maintain that he was never a partner.

3.    In addition, while employed by Stream Charlotte, Londry worked on a deal involving the sale of seventeen parcels of land in South Carolina (the PBC Deal). He terminated his employment with Stream Charlotte shortly before the PBC Deal closed. Both sides claim entitlement to the resulting commission. Defendants ask the Court to grant summary judgment against Plaintiffs on their claims, and

Plaintiffs argue affirmatively for summary judgment in their favor on their claim to the commissions.[1]

4. The Court, having considered the Motions, the exhibits submitted in support of and in opposition to the Motions, the related briefing, other relevant matters of record, and the arguments of counsel at a hearing on the Motions held 18 February 2025, concludes for the reasons stated below that Defendants' Motion should be **GRANTED in part** and **DENIED in part**, and Plaintiffs' Motion should be **DENIED**.

> *TLG Law, by David G. Redding and Tyler A. Rhoades, for Plaintiffs Jared Raymond Londry and Pointblank Ventures, LLC.*
>
> *Jackson Lewis P.C., by Daniel Leake II, and Kathleen K. Lucchesi, and Moore & Van Allen PLLC, by Scott M. Tyler and Katherine McDiarmid, for Defendants Stream Realty Partners, L.P., Stream Realty Partners-Charlotte, L.P., and Daniel Farrar.*

Earp, Judge.

## I. FACTUAL BACKGROUND

5. The Court does not make findings of fact on a motion for summary judgment. Instead, the Court summarizes material facts it considers to be uncontested. *See, e.g., Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 551 (2020).

---

[1] Neither Motion addresses Defendants' counterclaims for breach of fiduciary duty against Londry and tortious interference with prospective business relations/economic advantage against both Plaintiffs. (*See generally* Defs.' Answer and Countercl. to Pls.' Am. Compl. [Defs.' Answer and Countercl.], ECF No. 33.)

6. Londry is a real estate broker licensed in North and South Carolina. (First Am. Compl. [Am. Compl.] ¶¶ 7–8, ECF No. 32.) Defendant Daniel Farrar (Farrar) is a minority (30%) owner of Stream Charlotte who has worked in the property development and brokerage business for several years. (Am. Compl. ¶ 9; Defendants' Memo. of Law in Supp. of Mot. for Summ. J. [Defs.' Memo.], Video Dep. of Jared R. Londry [Defs.' Londry Dep.] 58:21–25, ECF No. 43.2.) The majority (70%) owner of Stream Charlotte is Stream Realty Partners, LP (Stream). (Defs.' Londry Dep. 58:21–25.)

**A. Londry's Recruitment to Stream Charlotte**

7. Londry and Farrar have been friends for more than a decade. (Defs.' Memo., Exhibit A Dep. of Daniel P. Farrar [Defs.' Farrar Dep.] 21:13–20, ECF No. 43.1.) In 2019, Farrar began recruiting Londry to work for Stream Charlotte, a commercial real estate limited partnership that provides services including leasing, property management, construction management, marketing, and sales. (Defs.' Farrar Dep. 23:17–24:12; Aff. of Daniel Farrar in Supp. of Defs.' Opp'n to Pls.' Mot. for Injunctive Relief [Farrar Aff.] ¶ 6, ECF No. 43.28.)

8. Londry and Farrar discussed a position in which Londry would oversee each of the firm's service lines and assist in growing the business. Meanwhile, Farrar's focus was to be on finding deals. (Defs.' Londry Dep. 37:14–16; Defs.' Farrar Dep. 30:20–31:14.) These conversations continued periodically until late 2020. (Defs.' Londry Dep. 32:3–8.)

9. On 24 September 2020, Londry traveled to Dallas, Texas to meet with Chris Jackson (Jackson), Stream Charlotte's President, and other partners of Stream to

discuss the possibility of Londry joining Stream Charlotte. (Pls.' Memo. in Opp. to Defs.' Mot. for Summary Judgment [Pls.' Memo.], Exhibit E, Jackson 9/22/20 Email, ECF No. 50.5.) Prior to the meeting, Farrar told Londry that Jackson and the other partners in Dallas would be the ones to make a final decision regarding Londry's possible partnership. (Defs.' Farrar Dep. 68:6–16.) Shortly after the meeting, on 12 October 2020, Londry was offered the position of Executive Managing Director of Stream Charlotte. (Defs.' Memo., Exhibit D, Jackson 10/12/20 Email: Stream Offer, ECF No. 43.4.)

10. Over the next few days, Londry and Jackson exchanged emails in which they negotiated the terms of Londry's employment, specifically his job title, his compensation, and his eligibility for partnership. (Defs.' Memo., Exhibit E, Jackson 10/15/20 Email: Stream Offer, ECF No. 43.5.) Londry made clear that ownership was "very important to [him] and something [he] had anticipated as part of the structure immediately." (Defs.' Exhibit E, Jackson 10/15/2020 Email: Stream Offer.) However, Jackson explained that Stream Charlotte's policy was for individuals to be employed for a period of time before becoming owners. (Defs.' Londry Dep. 54:2–11.)

11. Jackson's position with respect to Londry's ability to become a partner prompted conversations between Farrar and Londry in which Londry alleges that Farrar agreed to give Londry half of Farrar's 30% ownership interest in Stream Charlotte. According to Londry, the two shook hands in agreement. (Defs.' Londry Dep. 54:12–20, 57:20–24.)

12. Stream Charlotte sent Londry an Employment Agreement on 23 October 2020. The Employment Agreement established Londry's title as Executive Managing Director at a base salary of $120,000 and a $180,000 draw against commissions. Londry was also to receive "20% of Stream Charlotte's position in the ownership entity" of any acquisition that was sourced or developed by him and in which he participated in the processing, closing, and sale. Londry executed the Employment Agreement on 28 October 2020. (Defs.' Memo, Exhibit G, Employment Agreement [Employment Agreement], ECF No. 43.7.)

13. The Employment Agreement specified that Londry would "be considered for partnership in the Stream Charlotte partnership within one year of [his] anniversary date." (Employment Agreement at 1.) Even so, the Employment Agreement provided that Londry would be immediately eligible to receive compensation in the form of a profit participation equal to fifteen percent (15%) based on the profits from the Charlotte office deals. (Defs.' Exhibit E, 10/15/2020 Email from Londry to Jackson RE: Stream Offer.) These distributions were to be paid "in accordance with the other partners in the office." (Employment Agreement at 2.) But because the office was not profitable during Londry's tenure, no distributions were ever made. (Defs.' Farrar Dep. 101:18–25.)

14. Despite their earlier discussions, as part of the arrangement to employ Londry at Stream Charlotte, Farrar agreed to transfer half of his 30% ownership—not to Londry—but back to Stream, making Stream an 85% owner in Stream Charlotte. (Defs.' Memo., Exhibit F, Jackson Email 11/18/20, ECF No. 43.6.) Londry

admits that he did not sign any partnership agreement and that he never discussed with Farrar how Stream Charlotte's losses would be shared. (Defs.' Londry Dep. 54:21–24, 193:7–17.) Londry testified that in concluding that he was a partner in Stream Charlotte he relied on statements made by Farrar in which Farrar referred to him as "partner," including "I'm more fired up that we are partners" and "I am blessed to have you as a partner." (Pls.' Memo., Exhibit LL, ECF No. 50.37; Pls.' Memo., Exhibit MM, ECF No. 50.38.)

### B. Londry's Employment with Stream Charlotte

15. Londry began working for Stream Charlotte on 1 December 2020. (Defs.' Memo., Exhibit H, Londry Email 11/30/20, ECF No. 43.8; Defs.' Londry Dep. 32:1–2.) As Executive Managing Director, Londry was responsible for office operations, including (1) building Stream's presence in the Carolinas; (2) sourcing, winning, and executing Stream's service lines of business; (3) uncovering and executing acquisitions and development opportunities; (4) identifying, recruiting, and retaining talented team members; and (5) teaming with other Stream offices for the general success of all Stream business lines and offices. (Employment Agreement at 1; Farrar Aff. ¶ 10.)

16. During his time at Stream Charlotte, Londry helped establish Stream's presence in both Raleigh and Greenville, North Carolina. (Defs.' Farrar Dep. 94:21–95:6.) He also assisted in recruiting at least two employees to Stream Charlotte. (Defs.' Farrar Dep. 96:5–97:15.)

17. Nevertheless, by November 2021, Farrar was concerned about Londry's performance. (Defs.' Farrar Dep. 190:14–24.) By early 2022, Farrar had grown frustrated with Londry's lack of leadership and his complaints regarding the division of duties between Farrar and himself. (Pls.' Memo., Exhibit J, Londry and Farrar Email 4/8/22, ECF No. 50.10; Pls.' Memo., Exhibit K, ECF No. 50.11; Pls.' Memo., Exhibit H, ECF No. 50.8.) Even so, Farrar waived repayment of Londry's draw on at least one occasion when Londry did not have the commissions to cover it. (Defs.' Londry Dep. 142:12–143:1.)

18. In May 2022, Londry and Farrar traveled to Dallas to meet with Jackson and present Londry's ideas for the restructuring of Stream Charlotte's office. (Pls.' Memo., Exhibit L, ECF 50.13.) Jackson rejected Londry's suggestions during the meeting even though, according to Londry, Farrar had reviewed and approved the recommendations prior to the meeting. (Pls.' Memo. Exhibit L; Pls.' Memo., Exhibit A, Dep. of Daniel P. Farrar [Pls.' Farrar Dep.] 238:1–22, ECF No. 50.1; Pls.' Memo., Exhibit C. Video Dep. of Jared R. Londry [Pls.' Londry Dep.] 282:5–283:3, ECF No. 50.3.) Following this meeting, Farrar had private conversations with Jackson regarding his dissatisfaction with Londry's work for Stream Charlotte. (Pls.' Farrar Dep. 266:15–25.)

19. By November 2022, Londry had decided that he would no longer focus on leading the daily operations of the office and would instead focus on investment sales. (Defs.' Farrar Dep. 265:8–15.) On 28 November 2022, Farrar called a meeting with Londry to discuss "redefining" Londry's role at Stream Charlotte. (Defs.' Farrar Dep.

264:2–265:5.) Londry was directed to step down from his co-market leader role. (Defs.' Londry Dep. 142:1–3.) In his new role, Londry was to oversee only the capital markets team. He was no longer to receive 15% of the office's profits but would instead receive 15% of the profits generated by that single team. (Pls.' Memo, Exhibit P, Farrar and Londry December Text Messages, ECF No. 50.15;[2] Farrar Dep. 265:1–5.) Although Farrar had conversations with Jackson regarding the change in Londry's role, Farrar testified that the decision to change Londry's position was ultimately his call. (Pls.' Farrar Dep. 274:14–22.)

20. On 6 January 2023, Londry informed Farrar that he planned to leave Stream Charlotte and start his own company. (Defs.' Memo., Exhibit I, Liz Farrar Email 1/6/23, ECF No. 43.9.) Londry said that he would stay with Stream Charlotte until two of the deals on which he had been working—Chadbourn Mill (Chadbourn) and Grinnell WaterWorks (Grinnell)—closed in April or May. (Defs.' Londry Dep. 160:3–19.)

21. However, on 19 February 2023, Londry informed Farrar that his last day at Stream Charlotte would be 31 March 2023. (Pls.' Memo., Exhibit R, Londry and Farrar February Text Messages, ECF No. 50.17.) A few days later, Farrar informed Londry that his departure date had been accelerated to 10 March 2023. (Pls.' Memo., Exhibit T, Londry 2/23/23 Email, ECF No. 50.19.)

22. On 22 February 2023, Londry established Alpha Advisors LLC (Alpha) and became its sole member. (Defs.' Londry Dep. 158:14–25.) Alpha then became

---

[2] On the NCBC Docket, this exhibit is labeled as Exhibit O. However, in Plaintiffs' Memo. and on the actual document, it is referred to as Exhibit P. The Court cites to it as Exhibit P.

Pointblank Ventures, LLC (Pointblank), a North Carolina limited liability company, on 14 July 2023. (Defs.' Londry Dep. 159:3–12.)

23. Before he left, Londry exchanged emails with Farrar regarding the outstanding deals on which Londry's team had been working. (Defs.' Memo., Exhibit J, Londry 2/28/23 Email, ECF No. 43.10; Defs.' Memo., Exhibit V, Londry Email: Deal Updates 3/24/23, ECF No. 43.22.) There were eight, (Grove, Porter, Mint+Church, Coastal Commerce, Volvo, Garner, Meridian, and Velocity). Londry asserted that he was entitled to 15% of the profits from those deals once they closed. (Defs.' Exhibit J, Londry 2/28/23 Email.) He also demanded 10% of the development fees or "sweat equity" for the Mint + Church and Grove deals. (Defs.' Exhibit J, Londry 2/28/23 Email.)

24. According to Farrar, the Grove deal did not close (Defs.' Farrar Dep. 305:19–24); however, the record is unclear regarding whether any of the other deals closed. For his part, Farrar told Londry that Stream Charlotte no longer invests in deals (Defs.' Exhibit J, Londry 2/28/23 Email), and that sweat equity "doesn't remain in place after people are gone from Stream." (Defs.' Exhibit J, Londry 2/28/23 Email.) He testified that Stream Charlotte did not have an ownership stake in the deals in question. (Defs.' Farrar Dep. 302:10–24.)

25. Londry and Farrar also discussed two other deals, Chadbourn and Grinnell, both of which were set to close between April and May of 2023. (Defs.' Exhibit V, Londry Email: Deal Updates 3/24/23.) Londry said he planned to split his commissions with Alexander Olofson (Olofson), a Senior Associate who had worked

closely with him on those deals. (Defs.' Exhibit V, Londry Email: Deal Updates 3/24/23; Aff. of Alexander Olofson [Olofson Aff.] ¶ 2, ECF No. 22.2.) Since the filing of this Complaint, both Chadbourn and Grinnell have closed, and Londry has been paid for those deals. (Defs.' Farrar Dep. 301:12–21.)

**C.      The PBC Deal**

26.      Farrar and Londry also discussed the large PBC Deal involving seventeen properties in South Carolina (the PBC Property). Londry had worked with RCC Investors 1091 Morrison, LLC (RCC), the seller of the properties since March 2021 to find a buyer and broker a deal. (Aff. of David Londry [Londry Aff.] ¶ 7, ECF No. 11.) Olofson began assisting Londry with the PBC Deal in April 2021. (Defs.' Memo, Exhibit K, Dep. of Alex C. Olofson [Olofson Dep.] 14:9–15, ECF No. 43.11.)

27.      Sometime in 2021, Londry identified a potential purchaser with which he had a prior relationship, Asana Partners, LP (Asana). (Defs.' Londry Dep. 121:18–122:5.) Despite the fact that Farrar testified that it is standard practice at Stream Charlotte to obtain a listing agreement shortly after a prospective client is identified in order to establish an obligation on the part of the seller to pay a commission at closing, Londry never secured a listing agreement with RCC prior to his departure from Stream Charlotte. (Defs.' Londry Dep. 161:10–19; Olofson Dep. 17:4–8; Farrar Aff. ¶ 16.) Londry explained that he believes the timing of securing a listing agreement should be variable and depends on the client and the amount of trust in the relationship. (Defs.' Londry Dep. 162:4–17.)

28.     Asana made several offers to purchase the PBC Property prior to Londry's departure from Stream Charlotte in early 2023.  (Olofson Dep. 37:10–18.)   In December 2022, Asana told Londry it was interested in making a revised offer.  (Defs.' Memo. Exhibit L, 5/2/2023 Email from Olofson to Michael Heintz RE: Revencliff – Pacific Box Underwriting Email, ECF No. 43.12.)  In response, RCC compiled a due diligence report for Londry to present to Asana.  (Defs.' Exhibit L.)  Londry testified that the last communication he received from Asana before departing Stream Charlotte suggested to him that a deal was still a couple years away.  (Pls.' Memo., Exhibit V, Zoukis Email 3/7/23, ECF No. 50.21.)

29.     After leaving Stream Charlotte, Londry told Farrar that the PBC Property was not under contract and that the "seller side [was] holding his ground on price and gap [was] too wide."  (Defs.' Exhibit V, Londry Email: Deal Updates 3/24/23.)  Londry told Farrar that Stream Charlotte was free to pursue the PBC Deal independently. (Defs.' Exhibit V, Londry Email: Deal Updates 3/24/23.)

30.     Meanwhile, Londry continued to pursue the PBC Deal on behalf of his new firm, Alpha.  Asana submitted an offer on 13 March 2023 that was rejected by RCC, another offer on 22 March 2023 that was also rejected by RCC, and a final offer on 31 March 2023.  The final offer was accepted.  (Pls.' Memo., Exhibit X, Londry Email 3/13/23, ECF No. 50.23; Pls.' Memo., Exhibit Y, Muse Email 3/22/23, ECF No. 50.24; Pls.' Memo., Exhibit Z, Londry Email 3/31/23, ECF No. 50.25; Pls.' Memo., Exhibit AA, Londry Email 4/3/23, ECF No. 50.26.)  During these negotiations, Londry sent an email to Asana warning to "keep [the PBC] transaction 1000% internal to the

Asana walls" because "[s]omeone who's (sic) name I wont (sic) mention said they had heard you (sic) buying this portfolio." (Defs.' Memo., Exhibit W, 3/31/2023 Email from Muse to Londry RE: Asana Partners – Term Sheet – Raven Cliff Portfolio, ECF No. 43.23.) Despite the fact that he was communicating with Stream Charlotte about the PBC Deal during March 2023, Londry did not inform Olofson or Farrar of developments with respect to the sale. (Defs.' Londry Dep 234:21–25.)

31. It was not until after RCC accepted Asana's final offer that Londry finally sent RCC a draft listing agreement with his new firm, Alpha. (Defs.' Memo., Exhibit X, 4/3/2023 Email from Londry to Zoukis RE: SC Listing Agreement, ECF No. 43.24.) RCC responded on 3 April 2023 requesting that the agreement include an indemnification provision against any potential claims made by Stream. (Defs.' Memo. Exhibit Y, 4/3/2023 Email from Londry to Zoukis RE: Raven Cliff — Term Sheet, ECF No. 43.25.)

32. The final listing agreement between RCC and Alpha was executed on 11 May 2023. RCC appointed Alpha as its sole agent and agreed to pay a 0.65% commission. (Defs.' Memo., Exhibit Z Listing Agreement for Sale [Listing Agreement], ECF No. 43.26; Listing Agreement Exhibit A.) The Listing Agreement included the discussed indemnity provision:

> Indemnity. Alpha and Jared Londry hereby indemnify [RCC] against, and agree to hold harmless and defend (with counsel reasonably acceptable to [RCC]) [RCC] from and against any and all losses, claims, costs, expenses, demands, reasonable attorney's fees, suits, liabilities, judgments and damages caused by or related to (a) any claim of brokerage commission or finder's fees or any other like payment claims by any broker, individual or entity, including but not limited to [Stream], other than a broker which [RCC] has engaged, and (b) any

negligent acts, omissions, misconduct, or the breach of any of the terms of this Agreement by the (sic) Alpha, Jared Londry, any co-broker engaged by Alpha or either of such parties employees or agents. The provisions of this Paragraph 10 shall survive the expiration or earlier termination of this agreement.

(Listing Agreement ¶ 10.)

33. On 18 May 2023, RCC and Asana executed a purchase agreement for the PBC Property. (Defs.' Memo., Exhibit AA Agreement of Purchase and Sale [Purchase Agreement], ECF No. 43.27.) The Purchase Agreement represented that Alpha (Agent: Jared Londry) was the sole broker and would be paid a commission pursuant to the Listing Agreement. (Purchase Agreement § 12.)

34. Farrar learned of the closing on 18 May 2023, when Olofson was inadvertently copied on an email between Asana and Londry. (Olofson Dep. 85:10–24.) He contacted RCC to ask whether Stream Charlotte was included as a broker in the Listing Agreement. (Defs.' Farrar Dep. 330:24–331:6.) Farrar testified that he told RCC that he was asking for clarification, and he did not want to "f [the] deal up." (Defs.' Londry Dep. 10:8–19; Farrar Aff. ¶ 21.) Farrar then contacted Londry, Asana, and RCC requesting that the parties enter into an escrow agreement for the portion of the commission that Stream Charlotte and Olofson would have received had the listing agreement been executed during Londry's employment with Stream Charlotte. (Farrar Aff. ¶ 23.) Londry contends that he had no choice but to agree to the arrangement because to do otherwise would have risked the deal. (Londry Aff. ¶ 28.)

35. On 31 August 2023, Alpha, Londry, and Stream Charlotte entered into an Escrow Agreement. (Defs.' Memo., Exhibit DD Escrow Agreement [Escrow

Agreement], ECF No. 43.30.) The Escrow Agreement provided that $235,235.00 of the commission on the PBC deal would go to Alpha, while the remaining $375,765.00 would be held in escrow until joint written release/disbursement instructions were entered into by Alpha and Stream Charlotte. (Escrow Agreement ¶ 2.) The $375,765.00 remains in escrow. (Farrar Aff. ¶ 25.)

## II.   PROCEDURAL BACKGROUND

36.    Londry initiated this action by filing a Complaint on 25 July 2023. The Complaint asserts claims for: (1) breach of contract against Stream; (2) breach of contract against Stream Charlotte; (3) breach of partnership agreement against Farrar; (4) breach of fiduciary duty against Farrar; (5) fraud against Farrar, and (6) unfair and deceptive trade practices against all Defendants. (*See generally* Compl., ECF No. 3.)[3]

37.    Londry subsequently filed a Motion to Amend Complaint on 25 January 2024 seeking to add Pointblank (formerly Alpha) and a claim for wrongful interference with contract. (Pls.' Mot. to File Am. Compl., ECF No. 24.) The Court granted Londry's Motion for Leave to Amend on 29 February 2024, (ECF No. 30), and Plaintiffs filed an Amended Complaint on 4 March 2024. (*See* Am. Compl.)

38.    On 3 April 2024, Defendants filed their answer and affirmative defenses. Additionally, Stream Charlotte asserted counterclaims for (1) breach of fiduciary duty

---

[3] Londry then filed a Motion for Preliminary Injunction on 25 October 2023, seeking an order requiring Defendants to execute a joint written release and disbursement instructions directing the disbursement of the escrowed funds. (Mot. for Inj. Relief, ECF No. 9.) The Court denied the motion for injunctive relief by Order dated 28 December 2023. (Order on Mot. for Inj. Relief, ECF No. 23.)

against Londry; and (2) tortious interference with prospective business relations/economic advantage against both Londry and Pointblank. (Defs.' Answer and Countercl.) On 3 May 2024, Plaintiffs replied to Stream Charlotte's counterclaims. (Pls.' Reply to Countercl., ECF No. 35.)

39. Following discovery, Defendants filed their Motion for Summary Judgment on all Plaintiffs' claims. (Defs.' Mot. for Summ. J., ECF No. 42.) Thereafter, Plaintiffs filed their own Motion for Partial Summary Judgment with respect to their claim for wrongful interference with contract against Stream, Stream Charlotte, and Farrar. (Pls.' Mot. for Partial Summ. J., ECF No. 44.)

40. After full briefing, the Court held a hearing on the Motions on 18 February 2025. All parties were represented by counsel. (*See* Not. of Hr'g, ECF No. 49.)

41. The Motions are now ripe for disposition.

## III.   LEGAL STANDARD

42. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c).

43. Genuine issues of material fact are those "which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible

inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and internal quotation marks omitted).

44.    In reviewing a motion for summary judgment, the Court must consider all evidence in the light most favorable to the non-moving party. *Belmont Ass'n v. Farwig*, 381 N.C. 306, 310 (2022). Parties moving for summary judgment have the burden of establishing the lack of any triable issue of fact. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

45.    A movant may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). Should the movant satisfy its burden, "then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e) (emphasis omitted)).

46.    Affirmative summary judgment on a party's own claim for relief carries an even greater burden. *Brooks v. Mt. Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980). The moving party "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985).

47.     When ruling on a motion for summary judgment, the Court does not resolve contested issues of fact and must deny the motion if there is any genuine issue of material fact. *Singleton v. Stewart*, 280 N.C. 460, 464 (1972).

## IV.     ANALYSIS

48.     Defendants' Motion challenges all of Plaintiffs' claims, while Plaintiffs' Motion is for affirmative relief on their claim for wrongful interference with contract. The Court addresses each claim below.

### A.     **Breach of Contract**

49.     Londry's claims for breach of contract are brought against Stream and, in the alternative, against Stream Charlotte. (Am. Compl. ¶¶ 67–87.)

50.     The record reflects that Londry entered into an Employment Agreement with Stream to take a position with Stream Charlotte.[4]  He alleges that Defendants breached the Employment Agreement in four ways: (1) by divesting Londry of his partnership in Stream Charlotte; (2) by stripping Londry of his title as co-Market leader; (3) by failing to pay Londry commissions and profit participation in outstanding deals; and (4) by violating the implied covenant of good faith and fair dealing. (Am. Compl. ¶ 77.)

51.     To state a claim for breach of contract, Plaintiffs need only allege "(1) existence of a valid contract and (2) breach of the terms of the contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000); *see Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC

---

[4] Despite the language of the Employment Agreement, throughout Defendants' briefing they refer to Stream Charlotte, rather than Stream, as Londry's employer.  Given that Londry states the same claim against both entities and there is only one contract at issue, this inconsistency is not material to the Court's determination.

LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019) (observing that "stating a claim for breach of contract is a relatively low bar").

### i. Divestment of Partnership

52. Defendants maintain that during pre-employment negotiations, Jackson made it clear to Londry that Londry would not be joining Stream Charlotte as a partner. (Defs.' Memo. at 15.) Indeed, the Employment Agreement specifies that Londry would only be "considered for partnership in the Stream Charlotte partnership within one year of [his] anniversary date." (Defs.' Memo. at 15; *see also* Employment Agreement at 1.)

53. Plaintiffs respond that Londry was never considered for partnership as stated in the Employment Agreement because he was already a partner in Stream Charlotte from the start of his employment. (Pls.' Memo. at 17.) However, as stated below, the record does not support Londry's assertion that he began his relationship with Stream Charlotte as a partner. Moreover, it is undisputed that Londry was not invited to become a partner in Stream Charlotte during his employment.

54. Londry points to the fact that he was paid through a profit-sharing arrangement to support his conclusion that he was a partner in Stream Charlotte. But establishing a partnership requires more than evidence of a compensation arrangement, and there is no evidence in the record to indicate that Londry ever agreed to share in Stream Charlotte's losses. *See, e.g., La Familia Cosmovision, Inc. v. Inspiration Networks,* 2014 NCBC LEXIS 52, at *15 (N.C. Super. Ct. Oct. 20, 2014) ("[P]artnerships arise only where parties agree to "share the profits and losses in

equal or specified proportions.") (citing *Johnson v. Gill*, 235 N.C. 40, 45 (1952)). *See also Williams v. Biscuitville, Inc.*, 40 N.C. App. 405, 407–08 (1979) (finding no partnership despite profit sharing feature of plaintiff's compensation); *Zickgraf Hardwood Co. v. Seay*, 60 N.C. App. 128, 133–34 (1982) (holding that wife who performed secretarial and bookkeeping tasks was not a partner despite receiving a share of the profits as wages).

55. "A partnership is an association of two or more persons to carry on as co-owners a business for profit." N.C.G.S. § 59-36(a). While the receipt of a share of the profits of a business is prima facie evidence that a partnership exists, N.C.G.S. § 59-37(3)–(4), "no such inference shall be drawn if such profits were received in payment . . . [a]s wages of an employee[.]" N.C.G.S. § 59-37(4)(b).

56. Londry also argues that he became a partner in Stream Charlotte because Farrar transferred half of his own interest in Stream Charlotte to Londry. However, it is undisputed that Farrar did not transfer an ownership interest to Londry and instead transferred a 15% ownership interest back to Stream as part of Stream's agreement to bring Londry onboard. Consequently, Londry cannot find his way to a partnership interest in Stream Charlotte through an alleged agreement with Farrar.

57. Accordingly, Defendants' Motion with respect to Londry's contract claim alleging breach by divestment of a partnership interest in Stream Charlotte is **GRANTED**.

### ii. Stripping Londry of his Title as Co-Market Leader

58. Next, Plaintiffs allege that Londry's Employment Agreement was breached when he was stripped of his title as co-Market Leader. (Am. Compl. ¶ 77.)

59. Defendants respond that since the Employment Agreement was not for a definite period, Londry was employed at will, and they were free to alter the terms and conditions of Londry's employment at any time, including by changing his title. (Defs.' Memo. at 16.)

60. "North Carolina courts have repeatedly held that absent some form of contractual agreement between an employer and employee establishing a *definite* period of employment, the employment is presumed to be an 'at-will' employment, terminable at the will of either party, irrespective of the quality of performance by the other party, and the employee states no cause of action for breach of contract by alleging he has been discharged without just cause." *Harris v. Duke Power Co.*, 319 N.C. 627, 629 (1987) (citing *Still v. Lance*, 279 N.C. 254, 259 (1971)).

61. Londry was employed at will. If Stream Charlotte could terminate Londry at will, it could certainly change his job title. Accordingly, there was no breach of contract when Londry's title changed, and Defendants' Motion with respect to this aspect of the contract claim is **GRANTED**.

### iii. Payment of Commissions and Profit Participation on Outstanding Deals

62. Shortly after his termination, Londry demanded that he be paid 15% profit participation on eight deals: Grove, Porter, Mint+Church, Coastal Commerce, Volvo, Garner, Meridian, and Velocity. (Defs.' Exhibit J, Londry 2/28/23 Email.) Londry

further requested a 10% development fee for the Mint + Church and Grove deals. (Defs.' Exhibit J, Londry 2/28/23 Email.) There were multiple email exchanges regarding the amounts that Londry believed he was entitled to receive in these deals, (*see* Pls.' Memo., Exhibit I, ECF No. 50.9; Pls.' Exhibit J; Exhibit T; Exhibit RR, ECF No. 50.43); however, there is no indication in the record that Defendants ever agreed with Londry regarding how Londry was to be paid for them.

63. During the 18 February hearing, Defendants argued that Stream Charlotte never received payment for Grove because the deal "fell through." (Farrar Dep. 305:19–24.) They further argued that Londry was not entitled to be paid for the other seven deals because, according to Defendant's expert, the deals had not yet closed. Despite relying on Farrar's testimony and their expert report, Defendants failed to provide this evidence to the Court. Without evidence in the record to support Defendants' argument, the Court cannot consider it.

64. After careful review of the evidence that was presented, the Court concludes that genuine issues of material fact exist with respect to Londry's agreed compensation structure and the amounts he may still be due. There are indications that sometime during his tenure Londry's compensation structure deviated from that specified in his Employment Agreement. (*See* Employment Agreement at 2; *see also* Defs.' Exhibit J, Londry 2/28/23 Email (Londry requesting a 10% development fee or "sweat equity")).[5] Further, Farrar observed that sometime in early 2023 Stream

---

[5] Throughout the record, Londry and Farrar refer to the "sourcing fee" and "sweat equity" interchangeably. (Defs.' Farrar Dep. 38:21–39:2; Defs.' Londry Dep. 86:1–10.)

Charlotte stopped investing in deals, which affected the 15% ownership stake Londry claims to have had in those deals. (Defs.' Exhibit J, Londry 2/28/23 Email.) Given the lack of clarity in the record regarding Londry's promised compensation, as well as the parties' failure to provide clarity with respect to this issue in their briefs, Defendants' Motion with respect to this claim shall be **DENIED**.[6]

### iv. Breach of Covenant of Good Faith and Fair Dealing

65. North Carolina has long recognized that a covenant of good faith and fair dealing is implied in every contract and requires the contracting parties not to "do anything which injures the rights of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985) (citation omitted). It is a "basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56 (2005) (quoting *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 40 N.C. App. 743, 746 (1979)).

66. Where, as here, a claim for the breach of the implied covenant of good faith and fair dealing is based upon the same act as a claim for breach of contract, our Court of Appeals treats "the former claim as 'part and parcel' of the latter." *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018) (quoting *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 19 (1996), *disc. review denied*, 345 N.C.

---

[6] Londry does not contest that he was paid a commission on the Chadbourn and Grinnell deals that were set to close between April and May 2023. (Defs.' Farrar Dep. 301:12–21.)

344 (1997)). This means that the fate of an implied covenant claim rises and falls with the fate of the breach of contract claim if it is based on the same underlying facts. *Elior, Inc. v. Thomas*, 2024 NCBC LEXIS 61, at \*\*39 (N.C. Super. Ct. Apr. 22, 2024). In other words, if the breach of contract claim fails, there can be no breach of the implied covenant. *See Suntrust Bank v. Bryant/Sutphin Prop., LLC*, 222 N.C. App. 821, 833 (2012) ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of those same contracts."). However, the converse is also true: "[w]here the breach of contract claim survives, whether the implied covenant was one of the terms breached remains an issue to be determined." *Intersal, Inc. v. Wilson*, 2023 NCBC LEXIS 29, at \*\*68–69 (N.C. Super. Ct. Feb. 23, 2023).

67. Because Londry's claim to payment for the seven deals listed above is viable, Londry's claim for breach of the implied covenant of good faith and fair dealing based on that claim also remains, and Defendants' Motion is **DENIED**.

### B. Breach of Partnership Agreement

68. In addition to asserting that he was a partner in Stream Charlotte itself, Londry contends that Farrar agreed to form a *second* general partnership within the limited partnership of Stream Charlotte in which Farrar would cede half of his 30% ownership interest in Stream Charlotte to Londry in exchange for Londry agreeing to become employed. He claims that Farrar breached this 50/50 general partnership agreement. (Pls.' Memo. at 14.)

69.    Defendants respond that Plaintiffs' cause of action fails because no second partnership was ever formed.  (Defs.' Memo. at 16–18.)

70.    As this Court has previously observed, an "indispensable requisite" of a partnership is co-ownership of the business.  *La Familia Cosmovision, Inc.*, 2014 NCBC LEXIS 52, *15 (citing *McGurk v. Moore*, 234 N.C. 248, 252 (1951)).  Here, the business is Stream Charlotte.  Consequently, Londry's claim regarding a general partnership with Farrar to run Stream Charlotte collapses back into his claim that he was a partner in Stream Charlotte itself.

71.    By statute, and *unless a partnership agreement provides* otherwise, admission to a limited partnership requires the consent of all the other partners.  *See* N.C.G.S. § 59-704(a).    However, without the Stream Charlotte partnership agreement, the Court cannot determine whether Farrar even had the ability to transfer a portion of his own ownership interest to Londry.

72.     In addition, Farrar's alleged assignment would not transfer equity in the limited partnership to Londry absent a specific provision in the partnership agreement allowing it.  The Revised North Carolina Limited Partnership Act provides in relevant part:

> *Except as provided in the partnership agreement*, a partnership interest is assignable in whole or in part.  Subject to [N.C.]G.S. 59-801(3) an assignment of a partnership interest *does not* dissolve a limited partnership *or entitle the assignee to become or to exercise any rights of a partner*.  An assignment entitles the assignee to receive, to the extent assigned, only the allocation and distribution to which the assignor would be entitled.

N.C.G.S. § 59-702 (emphasis added).

73. Further, "[a]n assignee of a partnership interest, including an assignee of a general partner, may become a limited partner if and to the extent that (1) the assignor gives the assignee that right in accordance with authority described in the partnership agreement, or (2) all other partners consent." N.C.G.S. § 59-704(a). Here, there is evidence that Stream did not consent.

74. There is also evidence in the record to support Farrar's position that he did not assign an ownership interest to Londry at all. Instead, as part of the arrangement to bring Londry onboard, Defendants' evidence is that Farrar transferred half of his 30% ownership interest back to Stream, not Londry, making Stream an 85% owner in Stream Charlotte. (Defs.' Exhibit F, 11/18/2020 Email from Jackson to Glenn Koury RE: Charlotte.) Londry admits that he did not sign any partnership documents. (Londry Dep. 54:21–24, 193:3–17.)

75. Of further note is the absence of a variety of traditional indicia supporting the existence of a partnership. For example, there is no evidence that the parties ever filed a partnership tax return or established partnership bank accounts. Defendants argue that this proves that Londry and Farrar never agreed to all the essential terms of a partnership, including, in particular, an agreement to share losses jointly.

76. Finally, Londry protests that there is sufficient evidence of a general partnership with Farrar because Farrar occasionally referred to Londry as a "partner." (Pls.' Exhibit LL; Pls.' Exhibit MM.) Given the various contexts in which the word "partner" can be used, this fact carries little significance. *See Cutter v.*

*Vojnovic*, 2024 NCBC LEXIS 26, at **23 (N.C. Super. Ct. Feb. 16, 2024.)  In short, simply referring to another person as one's "partner" is far from sufficient to bestow ownership in a business.

77.     Nevertheless, absent Stream Charlotte's partnership agreement, and given the mix of evidence presented, the Court cannot conclude, as a matter of law, whether Londry and Farrar reached an enforceable agreement to divide Farrar's interest in Stream Charlotte.  Accordingly, on this record, Defendants' motion shall be **DENIED**.

## C.     <u>**Breach of Fiduciary Duty**</u>

78.     Londry alleges that Farrar, as his partner, breached a fiduciary duty to him by conspiring with Jackson to engineer the divestment of his alleged partnership in Stream Charlotte.  (Am. Compl. ¶¶ 89–90.)

79.     Defendants argue that Londry's claim for breach of fiduciary duty fails because no legal partnership existed and that without the existence of a partnership there is nothing to give rise to a *de jure* fiduciary duty.  (Defs.' Memo. at 18.)  Plaintiffs respond that whether a partnership existed between these two men giving rise to a fiduciary duty is a question for the jury to decide.

80.     "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties."  *Dalton v. Camp*, 353 N.C. 647, 651 (2001) (citing *Curl v. Key*, 311 N.C. 259, 264 (1984)).  "[A] fiduciary relationship is generally described as arising when 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.' " *Dallaire v. Bank of Am., N.A.*, 367 N.C.

363, 367 (2014) (quoting *Green v. Freeman*, 367 N.C. 136,141 (2014)). "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355, 826 S.E.2d 567 (2019).

81.    Partners in a legal partnership are each other's fiduciary as a matter of law. *See Casey v. Grantham*, 239 N.C. 121, 124 (1954) ("It is elementary that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith in their dealings with one another in respect to their partnership affairs.").

82.    As stated above, the Court cannot determine whether a legal partnership, and therefore an accompanying fiduciary relationship, existed between Londry and Farrar.  Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment with respect to Londry's claim for breach of fiduciary duty that might have arisen as a result of such a relationship.[7]

### D.    Fraud

83.    Plaintiffs claim that Farrar: (1) intentionally misrepresented that he and Londry would be equal partners in Stream Charlotte; (2) intentionally misrepresented that "there is no you and me, we're equal partners, and our success or lack of success in recruiting and profitability is both of ours;" and (3) allegedly

---

[7] The Court agrees with Defendants that the law regarding Plaintiffs' claim for breach of fiduciary duty arising from an alleged North Carolina general partnership between Londry and Farrar is distinct from that governing Defendants' counterclaim for breach of fiduciary duty arising from Londry's employment with Stream Charlotte, a Texas limited liability partnership. *See Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 596 (2018) ("[W]ith respect to limited partnerships, the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs. . . .").

concealed a conspiracy with Jackson to divest of Londry of his partnership interest. (Am. Compl. ¶¶ 93–95.) At oral argument, Plaintiffs conceded that they are not pursuing a claim for fraudulent inducement; rather their claim is for fraudulent misrepresentation with respect to the first two statements and fraudulent concealment with respect to the alleged conspiracy.

84. Defendants contend that each of the wrongs Plaintiffs identify in the Complaint constitute alleged breaches of the Employment Agreement and that a fraud claim must be distinct from a breach of contract claim to be actionable. (Defs.' Memo. at 19.)

85. The Court agrees. The economic loss rule limits "recovery in tort when a contract exists between the parties that defines the standard of conduct[.]" *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at **47–48 (N.C. Super. Ct. Nov. 3, 2011). Tort actions "must be grounded on a violation of a duty imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties[.]" *Asheville Contracting Co. v. Wilson*, 62 N.C. App. 329, 342 (1983).

86. In this case, Plaintiffs attempt to cloak their breach of contract claims in tort without identifying a separate legal right that was allegedly violated. The economic loss rule applies to bar this attempt. Accordingly, Defendants' Motion with respect to Plaintiffs' fraud claim shall be **GRANTED**.

E. **Wrongful Interference with Contract**

87. Both sides move for summary judgment on Plaintiffs' claim for wrongful interference with the listing agreement between Londry and Asana that provided for a commission on the PBC Deal.

88. To recover for wrongful interference with contract, Plaintiffs must show the following five elements: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 674 (1954)).

89. "If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221 (1988). The term malice in this context is used in its legal sense and is established "if it appears that the defendant with knowledge of the contract intentionally and without justification induced one of the contracting parties to break it." *Childress*, 240 N.C. at 675 (quoting *Meadowmoor Dairies v. Milk Wagon Drivers' Union*, 371 Ill. 377, 387 (1939)).

90. On the other hand, interference with contract is "justified if it is motivated by a legitimate business purpose, as when the plaintiff and defendant, an outsider, are competitors." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498 (1992). However, a defendant's interference is without privilege or justification if it is "not

reasonably related to the protection of a legitimate business interest[.]" *Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 134 (1989) (quoting *Smith v. Ford Motor Co.*, 289 N.C. 71, 94 (1976)).

91. In addition, the means by which the competition takes place must be lawful. "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by *means that are lawful*." *Hooks*, 322 N.C. at 221 (emphasis added); *cf. MarketPlace 4 Ins., LLC v. Vaughn*, 2023 NCBC LEXIS 31, at **35–36 (N.C. Super. Ct. Feb. 24, 2023) (determining that defendant's alleged unlawful use of confidential information, among other things, was not justified).

92. Plaintiffs assert that Farrar was improperly motivated to contact RCC to inquire about the commission received on the PBC Deal because: (1) Defendants sought to punish Londry for filing this action; (2) Defendants sought to use the short duration of time between the date Farrar contacted RCC and the date the PBC Deal was scheduled to close as leverage to force Londry to enter into the escrow agreement; and/or (3) Defendants sought to deprive Londry of income he was entitled to receive with the hope that he would dismiss the lawsuit or accept a settlement offer. (Pls.' Memo. at 20.)

93. Defendants respond that Plaintiffs' reliance on conclusory allegations in their unverified Amended Complaint is insufficient to avoid summary judgment. (Defs.' Memo. at 20.) They further contend that they did not act with legal malice but rather had a legitimate claim to a commission on the PBC Deal based on two years of

work performed by numerous Stream Charlotte personnel. (Defs.' Reply Br. to Pls.' Opp'n to Defs.' Mot. for Summ. J. [Defs.' Reply] at 8, ECF No. 52.)

94. The Court agrees with Defendants. It is undisputed that a valid contract existed between Londry and Asana and that Defendants had knowledge of that contract. However, absent from the record is evidence that Defendants' sole motivation in seeking a commission was to injure Plaintiffs. Rather, Farrar testified that "[i]t is common practice in the real estate industry for the commission to run through the original brokerage company subject to the agreed upon splits even if the broker has departed the company at the time of closing." (Farrar Aff. ¶ 21.) Given that Stream Charlotte personnel worked on the deal for two years before it closed, it is reasonable to expect Defendants to pursue a commission. The Court concludes that Londry has failed to establish the existence of legal malice in these circumstances.

95. Thus, Defendants' Motion with respect to Plaintiffs' claim for wrongful interference with contract is **GRANTED**. Plaintiffs' Motion on the same claim is **DENIED**.

F. **Unfair and Deceptive Trade Practices Act (UDTPA)**

96. Finally, Defendants move for summary judgment with respect to Plaintiffs' claim for violation of the UDTPA.

97. Under the North Carolina UDTPA, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a).

98. Three elements are required to maintain a cause of action under the Act: "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) proximately causing actual injury to defendant or defendant business." *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172 (1992).

99. Plaintiffs' UDTPA claim is premised on their breach of contract, breach of partnership agreement, and wrongful interference with contract claims. (Am. Compl. ¶¶ 113–18.) Defendants contend that since those other claims fail, the unfair and deceptive trade practices claim likewise fails. (Defs.' Memo. at 22.)

100. Because Plaintiffs' UDTPA claim is derivative of their other claims, it "therefore rises and falls with those claims." *Silverdeer, LLC v. Berton*, 2013 NCBC LEXIS 21, at **28 (N.C. Super. Ct. Apr. 24, 2013). As stated above, Londry's claims for breach of contract for failure to pay a commission and his claim against Farrar for breach of partnership agreement are still viable. However, those claims, without more, are insufficient to give rise to a UDTPA claim. *See, e.g., SciGrip, Inc. v. Osae*, 373 N.C. 409, 427 (2020) (holding that a breach of contract claim "standing alone, did not suffice to support the maintenance of an unfair and deceptive trade practices claim"); *Branch Banking and Trust Co. v. Thompson*, 107 N.C. App. 53, 62 (1992) ("[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1.").

101. To rise to the level of a UDTPA claim, a breach of contract must be egregious. *See Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C.

App. 378, 382 (2016) (when alleging a breach of contract as the basis for a UDTPA claim, "some type of egregious or aggravating circumstances must be alleged and proved before the [Act's] provisions may [take effect].") (citations omitted). No such evidence has been presented here. *See, e.g., Post v. Avita Drugs, LLC,* 2017 NCBC LEXIS 95, at \*10–12 (N.C. Super. Ct. Oct. 11, 2017) (collecting cases on aggravating circumstances that may or may not support a UDTPA claim). Plaintiffs' argument is not that he was fraudulently induced, but that Defendants did not perform as they had promised. "[T]he North Carolina Court of Appeals has repeatedly stressed that a [UDTPA] violation 'is unlikely to occur during the course of contractual performance.'" *Id.* at \*11 (citing *Heron Bay Acquisition LLC*, 245 N.C. App. at 383).

102. Accordingly, Defendants' Motion is **GRANTED** as to Plaintiffs' UDTPA claim.

## V. CONCLUSION

103. **WHEREFORE**, for the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment, **DENIES** Plaintiffs' Partial Motion for Summary Judgment and **ORDERS** as follows:

a. With respect to the First and Second Causes of Action (Breach of Contract Against Stream and Against Stream Charlotte) for allegedly divesting Londry of his partnership and stripping him of his title as co-Market Leader, the Fifth Cause of Action (Fraud against Farrar), and the Seventh Cause of Action (Unfair Trade Practice against all Defendants), Defendants' Motion for Summary Judgment is **GRANTED**.

b. With respect to the First and Second Causes of Action (Breach of Contract Against Stream and Against Stream Charlotte) for failing to pay commissions and profit participation and violating the implied covenant of good faith and fair dealing, the Third Cause of Action (Breach of Partnership Agreement against Farrar), and the Fourth Cause of Action (Breach of Fiduciary Duty against Farrar) for breach of fiduciary duty based on an alleged partnership, Defendants' Motion is **DENIED**.

c. With respect to the Sixth Cause of Action (Wrongful Interference with Contract against all Defendants), Defendants' Motion is **GRANTED** and Plaintiffs' Motion is **DENIED**.

d. The Court shall set a status conference to determine a trial date in this matter after consultation with counsel.

**SO ORDERED**, this the 7th day of July 2025.

/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
for Complex Business Cases